GIBSON & PERIN CO. et al., Plaintiffs-Appellees and Cross-Appellants,

v.

CITY OF CINCINNATI et al., Defendants-Appellants and Cross-Appellees.

Nos. 72–1607, 72–1608.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 31, 1973.

Decided June 26, 1973.

Edwards, Circuit Judge, concurred specially and filed opinion.

S. Arthur Spiegel, Cincinnati, Ohio, for Gibson & Perin Co.; Cohen, Todd, Kite & Spiegel, Cincinnati, Ohio, on brief; Hawley Todd, Marshall C. Hunt, Jr., Cincinnati, Ohio, of counsel.

A. David Nichols, Cincinnati, Ohio, William Chadeayne, Columbus, Ohio, for City of Cincinnati, and others; Isabel Guy, Acting City Sol., Thomas F. Rehme, Asst. City Sol., Cincinnati, Ohio, on brief.

Bricker, Evatt, Barton & Eckler, Columbus, Ohio, for Associated Dry Goods Corp. and Cincinnati Redevelopment Corp.; Russell Leach, H. Franklin Crawford, III, John F. Birath, Jr., Columbus, Ohio, of counsel.

Before WEICK, EDWARDS and CELEBREZZE, Circuit Judges.

WEICK, Circuit Judge.

The controversy in this case arose out of the Cincinnati Business District Core Project Urban Renewal Plan, hereinafter referred to as "Plan", which Plan was adopted by ordinance passed by City Council in 1962 after two public hearings. The Plan was amended in 1964 and 1965. Under this Plan old, dilapidated business buildings in blighted areas of Cincinnati have been razed and

replaced with fine, new, privately-owned buildings, with the help of private industry. We agree with the District Judge that urban renewal in Cincinnati has been an outstanding success and a real boon to the City.

Of the many new buildings that have been constructed under the Plan, only the one in issue here has been questioned, and that is Pogue's seven-story, shoppers' parking garage, which opened on June 1, 1967. Although it was characterized by the District Court as a single-purpose parking garage designed primarily to serve Pogue's department store, actually it serves not only shoppers at Pogue's and other department stores, but also it serves customers for other business places in that downtown area. It serves also people who are attending other evening functions in the area of the garage. The fact is that the garage is open to the general public twenty-four hours a day, seven days a week. It accommodates at least 1,200 cars, which is about four times more parking space than was previously available in the area, and really consists of two garages. It also has space for retail businesses on the ground floor, part of which already has been rented to Closson's.

The plaintiffs are retail merchants and the owner of a French restaurant, all with places of business owned or leased on the south side of Fourth Street (but outside the Urban Renewal Area), and located on the opposite side of Fourth Street from Pogue's parking garage. They do not like the design and location of the parking garage.

Plaintiffs claim, and the District Court found, that plaintiffs—

" . . . were led to expect that the north side of Fourth Street would be developed for retail and office space, with a shopper's garage on Elm Street between Fourth and Fifth Streets;" that instead, the City—

" . . . not only approved the construction of the garage on Fourth Street between Elm and Race, but approved a single-purpose shopper's garage wth scissors ramps designed solely for Pogue's whose store is east of Block D at the corner of Fourth and Race Streets. . . .";

that the change in the Plan was made without a public hearing; that a portion of Fourth Street was vacated without notice to the plaintiffs; that the ramps on Fourth Street impede pedestrian traffic on the northerly side of Fourth Street and adversely affect plaintiffs' businesses located on the opposite side of Fourth Street. Actually, the scissors ramps protect pedestrians who walk on the public sidewalk underneath the ramps. Without the ramps the automobiles entering and exiting the garage on Fourth Street would be at the same level as the public sidewalk, and it would be very dangerous for pedestrians to walk thereon.

In their third amended complaint filed in 1969, the plaintiffs, in addition to the foregoing, have charged the defendants with violation of their civil rights, conspiracy, fraud, violation of federal and state antitrust laws, and with everything else that they could think of including the charge of depriving them of due process of law and the equal protection of the laws. They asked for injunctive relief and damages.

Defendants in the case, named in the Third Amended Complaint, were the City of Cincinnati; William C. Wichman, who was City Manager, and is now deceased; Cincinnati Redevelopment Corporation [CRC], a private Ohio corporation for profit, which purchased the land from the City after the City had acquired it by condemnation or by purchase, and had razed the old buildings. (CRC constructed the new parking garage thereon and sold and conveyed it for $4,000,000 to Adcor Realty Co., a subsidiary of Associated Dry Goods, Inc., which is also the parent corporation of H & S Pogue Co., Inc., a department store.) Continuing the list of defendants: Associated Dry Goods Co.; H & S Pogue Co., Inc.; Adcor Realty Co.; Morgan Guaranty Trust Co., which ac-

quired the title to the property from Adcor Realty Co. under a lease-back arrangement for the operation of the Pogue department store; the Regional Director of HUD; and the Secretary of the Department of Housing and Urban Development, the latter two of whom were voluntarily dismissed from the case.[1]

The District Court heard the case without a jury and decided against the plaintiffs on the issues of conspiracy, fraud and antitrust violations, but found in favor of the plaintiffs on the issue that the construction of the garage on Fourth Street, rather than on Elm Street, violated the Urban Renewal Plan, and that plaintiffs, although located outside the Urban Renewal area, had standing to file the action. The Court entered a mandatory—

" . . . injunction against the City and Pogue's Division of Associated Dry Goods Corporation, jointly and severally, requiring them to alter the Pogue completed garage by installing two elevators at Fourth and Elm Street (in addition to the existing three elevators only 80 feet from the northwest corner of Fourth and Race Street) and to improve the fire tower on Fourth Street so that it and the elevators can serve the area in which the plaintiffs are located and thus counteract the blighting effect of the garage as constructed." (App.Vol. I, p. 55)[2]

1. The original complaint was filed in the District Court on July 2, 1966, about a year after CRC had acquired the land from the City at a cost of $587,770.04. In the original complaint there was no charge of antitrust violation.

On February 21, 1967, the District Court denied plaintiffs' application for a preliminary injunction, to enjoin completion of the garage. An Amended Complaint was filed on June 8, 1967; the Third Amended Complaint was filed on January 27, 1969; the trial commenced on June 2, 1970, and was concluded on June 25, 1970; the Memorandum Opinion of the District Court was filed on July 26, 1971.

We affirm the District Court in its decision that there was no conspiracy, fraud or antitrust violation. We reverse the mandatory injunction issued against the City and Pogue's.

I

## STANDING

Pogue's new garage is located in Urban Renewal Block D, which block consists of an entire city block, bounded on the north by Fifth Street, on the south by Fourth Street, on the east by Race Street, and on the west by Elm Street.

Only the plaintiffs, whose places of business are located outside the Urban Renewal area, have filed suit. They claim that the location and design of the garage have resulted in economic injury to them.

The threshold question therefore is whether persons located outside the Urban Renewal area have standing to maintain this action. We are of the opinion that plaintiffs do not have standing.

Plaintiffs contended in the District Court that they do have standing on the following grounds:

1) As federal taxpayers;

2) Under the Administrative Procedure Act;

3) As persons having a personal stake in the outcome of the case; and

4) As private attorneys general.

2. Plaintiffs, who are located on the south side of Fourth Street, and their customers, would have to walk only eighty feet from the northwest corner of Fourth and Race Streets to use the existing three elevators in the garage. There is no proof that the existing elevators are not adequate to serve properly the garage. Aside from the damage to the garage occasioned by the construction of unneeded additional elevators, the construction ordered by the Court might cost as much as $350,000. The exact amount of the construction so ordered has not been determined since the plans therefor have not been prepared.

The District Court ruled that plaintiffs' contentions were untenable as federal taxpayers and under the Administrative Procedure Act. We agree. The Court, however, held that they had standing as persons having a personal stake in the outcome of the case, and as private attorneys general. We disagree.

■ No cases have been cited to us by the Court or by the parties, nor have we found any cases, where persons located outside the Urban Renewal area have been permitted to question the design or location of buildings approved by the agency (the City, in the present case) as being in conformity with the Plan, said agency having been authorized by Congress to act. There is no general statutory right of appeal to the United States District Courts from decisions of federal, local or public agencies, and private persons engaged in urban renewal projects under 42 U.S.C. § 1450 et seq. The Secretary is authorized to sue and to be used. 42 U.S.C. § 1456(c)(1). Suits, of course, could be filed for violation of specific regulations adopted by the Secretary of HUD under the provisions of § 1455(c)(1) by persons having standing.

■ Nor do we find authority for the mandatory order issued by the District Court ordering the City and the purchaser of property from the redeveloper, to make changes in completed buildings which the purchaser had acquired in good faith and for which it had paid a large sum of money.

The District Court recognized that it was charting a new course in virgin territory,—a course which we believe would have an adverse effect on future Urban Renewal projects, if persons located outside the project may question the decisions relating to the project made by the duly authorized local public agencies.

Not only was the project approved by HUD, but the Plan and the design and location of the garage were specifically approved by the City.

■ Standing to sue as "private attorneys general" rests on an explicit provision in the regulatory statute conferring standing, which is absent here. Data Processing Service v. Camp, 397 U.S. 150, 153 n. 1, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970).

■ Review of decisions of federal agencies may be obtained under the Administrative Procedure Act. Contrary to plaintiffs' claims, the City is not a federal agency as defined in the Act. 5 U.S.C. § 701(b)(1). Furthermore, the Director and the Secretary of the federal agency were voluntarily dismissed from the case by the plaintiffs.

■ The Act does not confer standing to seek judicial review upon anyone who suffers economic injury as a result of agency action, regardless of whether that person's private rights have been invaded. Woodland Market Realty Co. v. City of Cleveland, 426 F.2d 955 (6th Cir. 1970); Harrison-Halsted Community Group, Inc. v. Housing & Home Finance Agency, 310 F.2d 99 (7th Cir. 1962).

■ Plaintiffs have no standing as federal taxpayers to question the design and location of the garage. They have not established a logical link between their status and the type of legislation which they are attempting to attack. They have not challenged a congressional enactment under the taxing and spending clause of Art. I, Sec. 8 of the Constitution, which is a prerequisite for standing under Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). In addition, the Court said:

" . . . [T]he taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the con-

troversy and will be a proper and appropriate party to invoke a federal court's jurisdiction." (*Id.* at 102–103, 88 S.Ct. at 1954).

No such nexuses have been established. Indeed, plaintiffs have not established any violation of a specific statute or constitutional provision.

The District Court relied on Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), wherein standing was held to exist in petitioner, a data processing company, to review a decision of the Comptroller of the Currency permitting National Banks, such as the respondent bank, to make data processing services available to other banks and bank customers. Review was provided for by the Administrative Procedure Act.

In addition to plaintiffs' claim to economic injury because of competition from the banks, the interest which they sought to protect was arguably within the zone of interests to be protected and regulated by statute.

To the same effect is Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), wherein review was sought under the Administrative Procedure Act. The Court, following *Data Processing Service, supra,* held that farmers who were eligible for payments under the Food and Agricultural Act of 1965, had standing to challenge the validity of an amended regulation issued by the Secretary of Agriculture, which amended regulation, they alleged, violated the Act.

The Court further held that the farmers had a personal stake and interest; that they were clearly within the zone of interests protected by the Act; and that the statutory scheme evinces a congressional intent that the Secretary's decision may be judicially reviewed.

Both *Data Processing* and *Barlow,* (unlike the present case) involve reviews sought under the Administrative Procedure Act. Both cases involved persons within the zone of interests protected, which is not true in the present case as plaintiffs' businesses were located outside the Urban Renewal area. While in *Data Processing* the Court found no prohibition against review, in *Barlow* the Court found congressional intent favoring review.[3]

In our case no review was provided by statute of acts of agencies and private developers of Urban Renewal projects. We think it was because review would frustrate implementation of Urban Renewal plans and would discourage cities and redevelopers who might not want to become embroiled in protracted litigation, particularly after they had expended their money to participate in the project.

In our case, under no stretch of the imagination can it be claimed that plaintiffs, who were located outside the Urban Renewal area, were within the zone of interests protected by the statute. Since they had no money invested in the structures located in the Urban Renewal area, they had no personal interest or stake in the project.

The decision in Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), is against the plaintiffs, as the Court held there that even under the Administrative Procedure Act the plaintiff and its members, who allegedly had a special interest in the conservation and the sound maintenance of the natural parks, game refuges, and forests of the county, did not have standing to en-

---

**3.** The District Court relied heavily on Norwalk v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968), which we believe is inapposite. In *Norwalk* the plaintiffs were directly involved (by removal) in the Urban Renewal scheme. They alleged violation of a specific standard in the Urban Renewal Act, as well as racial discrimination. The complaint was dismissed on motion and the allegations were accepted as true. Foster v. City of Detroit, 254 F.Supp. 655 (E.D. Mich., 1966), aff'd 405 F.2d 138 (6th Cir. 1968) is likewise inapplicable, as it involved due process violations in Detroit's condemnation procedures concerning the right to compensation on the part of property owners whose lands were taken.

join federal officials from approving an extensive skiing development in the Mineral King Valley in the Sequoia National Forest. Petitioners in that case had not alleged that the challenged development would affect the Club or its members in their activities, or that they even used Mineral King, but alleged that the project would adversely change the area's aesthetics and ecology.

█ In our case, the District Court in its opinion stated:

"It seems clear to the Court that the City could not have condemned the property in the south half of Block D for the purpose of erecting a garage such as the one the Developer built to the specifications of Pogue's.

"In effect this would be condemning property for private purposes, and it needs no citation of authority to say that is not permitted." (App. I, p. 59).

This proposition was set to rest in the leading case on Urban Renewal, which case involved the District of Columbia. In Berman v. Parker, 348 U.S. 26, 75 S. Ct. 98, 99 L.Ed. 27 (1954), Mr. Justice Douglas, who wrote the opinion for the Court, stated:

"Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. See Luxton v. North River Bridge Co., 153 U.S. 525, 529–530 [, 14 S.Ct. 891, 892] 38 L.Ed.2d 808; United States v. Gettysburg Electric R. Co., 160 U.S. 668, 679 [, 16 S.Ct. 427, 429] 40 L.Ed. 576. Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress

alone to determine, once the public purpose has been established. See Luxton v. North River Bridge Co., *supra; cf.* Highland v. Russell Car Co., 279 U.S. 253 [, 49 S.Ct. 314] 73 L.Ed. 688. The public end may be as well or better served through an agency of private enterprise than through a department of government—or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects. What we have said also disposes of any contention concerning the fact that certain property owners in the area may be permitted to repurchase their properties for redevelopment in harmony with the overall plan. That, too, is a legitimate means which Congress and its agencies may adopt, if they choose. (Id. at 33–34, 75 S.Ct. at 103)."

In making it clear that it is not the function of the Courts to sit in review of legislative determinations, the Court stated:

". . . But we have said enough to indicate that it is the need of the area as a whole which Congress and its agencies are evaluating. If owner after owner were permitted to resist these redevelopment programs on the ground that his particular property was not being used against the public interest, integrated plans for redevelopment would suffer greatly. The argument pressed on us is, indeed, a plea to substitute the landowner's standard of the public need for the standard prescribed by Congress. But as we have already stated, community redevelopment programs need not, by force of the Constitution, be on a piecemeal basis—lot by lot, building by building.

It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area. Once the question of the public purpose has been decided, the amount and character of land to be taken for the project and the need

for a particular tract to complete the integrated plan rests in the discretion of the legislative branch. See Shoemaker v. United States, 147 U.S. 282, 298 [, 13 S.Ct. 361, 390] 37 L.Ed. 170; United States ex rel. Tennessee Valley Authority v. Welch, *supra*, [327 U.S. 546] at page 554 [, 66 S.Ct. 715, at 718, 90 L.Ed. 843]; United States v. Carmack, 329 U.S. 230, 247 [, 67 S.Ct. 252, 260] 91 L.Ed. 209.

The District Court indicated grave doubts concerning the Agency's right to take full title to land as distinguished from the objectional buildings located on it. 117 F.Supp. 705, 715–719. We do not share those doubts. If the Agency considers it necessary in carrying out the redevelopment project to take full title to the real property involved, it may do so. It is not for the courts to determine whether it is necessary for successful consummation of the project that unsafe, unsightly, or insanitary buildings alone be taken or whether title to the land be included, any more than it is the function of the courts to sort and choose among the various parcels selected for condemnation.

The rights of these property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking." (*Id.* at 35–36, 75 S.Ct. at 104).

■ The title to the land in Block D, on part of which the garage was constructed, was acquired by the City, either by purchase or condemnation. No such defense was interposed in any condemnation suit, nor is there any proof that any purchases made by the City were other than voluntary. The title of the purchaser may not be collaterally attacked here.

The case closest in point to the present one is our decision in Woodland Market Realty Co. v. City of Cleveland, 426 F.2d 955 (6th Cir. 1970). In that case the plaintiff, which held a leasehold interest in certain commercial property located in Cleveland, sued the City for damages to its leasehold interest, the value of which was alleged to have been destroyed by the activity of the City in establishing its Urban Renewal project. Plaintiff claimed that such activity violated its rights under the Fifth and Fourteenth Amendments to the Constitution. Plaintiff alleged that its leasehold was originally included in the Urban Renewal project, but that the City later excluded it and acquired instead adjacent property belonging to plaintiff's tenants, thereby depriving plaintiff of its tenants.

In affirming the judgment of the District Court dismissing the complaint, we stated that there had been no taking of plaintiff's property within the meaning of the Fifth and Fourteenth Amendments requiring the payment of just compensation; that the losses sustained by plaintiff did not result from any intrusion or encroachment on plaintiff's property. "Its leasehold estate has remained intact." *Id.* at 958. Plaintiff's losses resulted from the transformation of the neighborhood from a residential neighborhood to vacant land. We followed Berman v. Parker, *supra*, in holding that the drawing of boundary lines for a public project is a matter of legislative discretion, and it is not the function of the courts to review such discretion. We stated:

"When reduced to its essence, the issue presented upon this appeal is whether a property owner having property adjacent to an urban renewal project may maintain an action for compensation under the Fifth and Fourteenth Amendments of the Federal Constitution for depreciation in the value of his property by reason of the establishment of the project. This Court is of the opinion that he cannot." (*Id.* 426 F.2d at 959).

In Campbell v. United States, 266 U.S. 368, 45 S.Ct. 115, 69 L.Ed. 328 (1924), the Court held that a property owner, a portion of whose land was condemned for a public purpose, was not entitled to compensation for damages to the residue

occasioned by the acquisition and use of adjoining lands of others for the same project.

We followed Berman v. Parker, *supra*, in Nashville I–40 Steering Comm. v. Ellington, 387 F.2d 179 (6th Cir. 1967), holding that the routing of public highways was a prerogative of the executive department of the state, and not the judiciary.

 Further, in order to have standing, plaintiffs must establish that they have a legal interest to maintain the suit, that the right invaded—

> ". . . is a legal right,—one of property, one arising out of contract, one protected against tortious invasion, or one founded on a statute which confers a privilege." (Tennessee Power Co. v. TVA, 306 U.S. 118, 137, 59 S.Ct. 366, 369, 83 L.Ed. 543 (1939)).

See also United States ex rel. TVA v. Welch, 327 U.S. 546, 66 S.Ct. 715, 90 L. Ed. 843 (1946); Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L. Ed. 374 (1938). Plaintiffs have established no such rights. Whatever damages plaintiffs sustained as a result of the Urban Renewal project are *damnum absque injuria.*

 Under Ohio law plaintiffs, as owners or lessees of land abutting on the south side of Fourth Street, have no property right in the continuation or maintenance of the flow of traffic past their property, and the diversion of traffic as a result of public improvement is not an impairment of a property right for which damages may be awarded. State ex rel. Merritt v. Linzell, 163 Ohio St. 97, 126 N.E.2d 53 (1955). As a matter of fact, the width of Fourth Street was not changed in the improvement.

 Plaintiffs complain about not having received notice from the City of the vacation of a portion of Fourth Street. Actually, the portion vacated was not the traveled portion of the street, but included the north sidewalk,

the location of which was changed by an exchange of easements and was relocated on Pogue's property and underneath the ramps. Plaintiffs were not abutting owners of land on the north side of Fourth Street and were not entitled to notice under Ohio law. Ohio Rev.Code, § 723.06.

In essence, all that plaintiffs are really complaining about is the fact that they did not receive the benefits from the Urban Renewal project which they expected.

## II

### LIABILITY OF THE CITY OF CINCINNATI

 The City is a political subdivision of the State of Ohio. It is not a "person" within the meaning of the Civil Rights Act and Congress did not intend that municipal corporations should be amenable to the Act. 28 U.S.C. § 1343; 42 U.S.C. § 1983; Moor v. County of Alameda, 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961); Johnson v. City of Cincinnati, 450 F.2d 796, 798 (6th Cir. 1971).

 There is an additional reason why the City cannot be held liable in this action. In its activities under the Urban Renewal project it was engaged in the performance of a governmental, and not a proprietary, function. It was exercising the police power of the state. It cannot be held liable for the performance of such acts. Broughton v. Cleveland, 167 Ohio St. 29, 146 N.E.2d 301 (1957); Wooster v. Arbenz, 116 Ohio St. 281, 156 N.E. 210 (1927).

## III

### LIABILITY OF POGUE INTERESTS

Inasmuch as the City is not liable for economic injury allegedly sustained by plaintiffs on account of the Urban Renewal Plan, it is difficult to see how Pogue's, whose sin was to purchase a

completed garage and to pay $4,000,000 for it, could possibly be held liable.

Plaintiffs complain that the Plan was changed to locate the garage on Fourth Street instead of on Elm Street. Actually, it is located on both streets. The City contends that the Plan was never changed; that brochures, reports, newspaper articles, etc., on which plaintiffs and the District Court relied as indicating a location on Elm Street, were illustrative only and were not a part of the Plan. City Council did approve the design and location of the garage.

■ But even if the City did change the location and design, it had the right to do so, as was held in *Woodland Market Realty, supra,* where the city changed its original plan to include plaintiffs in the urban renewal area and then changed its plan to exclude plaintiffs.

In our opinion, a public hearing was not required even if the City did change the design or location of a building in Block D.

Plaintiffs were tardy in filing their suit nearly one year after the City had passed an ordinance approving the bid of CRC as being "in accordance with the Urban Renewal Plan," and after the property was conveyed by the City to the redeveloper.

## IV

### ANTI-TRUST VIOLATIONS

The District Court found that there was no evidence of any conspiracy to restrain trade. We agree.

Although most of the plaintiffs and Pogue's have been engaged in business in Cincinnati for many years, no claim of antitrust violation was ever made against Pogue's until after it acquired its new garage.

■ Participation in an Urban Renewal project does not violate the antitrust laws.

■ Plaintiffs allege that the relevant market was a "dramatic elbow" at the corner of Fourth and Elm Streets.

This claim is ridiculous. There was no proof of any relevant market. There was no proof of any real competition between the plaintiffs and Pogue's. The antitrust claims are frivolous.

The judgment of the District Court is reversed and the cause is remanded with instructions to dismiss the complaint.

EDWARDS, Circuit Judge (concurring specially).

This is a complex and difficult case. In my judgment there is merit to the plaintiffs' claims of economic injury as found by the District Judge. Unfortunately for plaintiffs, however, both the applicable statutes and the case law require decision of the merits of those claims before the legislative body of the City of Cincinnati, and do not allow for the subsequent judicial remedy ordered by the District Judge.

I join the result reached by Judge Weick's opinion. I also join it in its disposition of plaintiffs' antitrust appeal and in its disposition of plaintiffs' claims of city ordinance and state law violations.

I also agree that no appeal procedure from the legislative decisions of the Cincinnati City Council pertaining to the Council's formulation and adoption of the Urban Renewal Plan was provided by Congress in 42 U.S.C. § 1450 et seq. (1970), and that under the fact posture of this case no appeal is permissible under the terms of the Administrative Procedures Act, 5 U.S.C. § 702 (1970).

I believe, however, that the findings of fact of the District Judge concerning plaintiffs' claims of economic injury are not clearly erroneous and that plaintiffs had standing to bring this suit. *See* Data Processing Service Corp. v. Camp, 379 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). In my judgment, however, the proofs do not serve to support the District Judge's conclusion of violations of plaintiffs' Fourteenth Amendment rights to due process and equal protection, and hence, this case should have been dismissed under the authority of

Berman v. Parker, 348 U.S. 20, 75 S.Ct. 98, 99 L.Ed. 27 (1954); United States ex rel. TVA v. Welch, 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946); Tennessee Electric Power v. TVA, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543 (1939), and Woodland Market Realty Co. v. City of Cleveland, 426 F.2d 955 (6th Cir. 1970).

As to Foster v. City of Detroit, 405 F.2d 138 (6th Cir. 1968), and Norwalk v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968), I consider them not controlling for the reasons set forth in footnote 3 to Judge Weick's opinion.