**UNITED STATES of America, Plaintiff,**

v.

**CERTAIN LAND SITUATED IN the CITY OF DETROIT, WAYNE COUNTY, STATE of MICHIGAN and The Detroit International Bridge Company, et al., Defendants,**

v.

**COMMODITIES EXPORT COMPANY and Walter H. Lubienski, Intervenors.**

No. 79–73934.

United States District Court, E.D. Michigan, Southern Division.

Dec. 30, 1994.

Donald F. Rosendorf, Washington, DC, Roger E. Craig, Naples, FL, Walter H. Lubienski, Detroit, MI, for plaintiff.

James F. Hibey, Washington, DC, Dale W. Rhodes, Grand Rapids, MI, for defendants.

## OPINION AND ORDER REGARDING INTERVENORS' MOTION FOR PRELIMINARY INJUNCTION

ROSEN, District Judge.

### I. INTRODUCTION

On October 12, 1993, the Sixth Circuit reversed this Court's decision denying Commodities Export Company and Walter H. Lubienski's motion to intervene in this condemnation action, holding that Commodities and Lubienski were entitled to intervention as a matter of right. In so doing, the appellate court made no determination and no findings with respect to Commodities and Lubienski's proposed motion for preliminary injunction,[1] and instead ordered that the case be remanded to this Court for a determination of the intervenors' entitlement to the requested preliminary injunctive relief.

With respect to the motion for preliminary injunction the Court of Appeals stated only the following:

> The district court denied Commodities and Lubienski's motion for preliminary injunction. We review the district court's decision [regarding a motion for preliminary injunction] for an abuse of discretion. *See International Resources, Inc. v. New York Life Ins. Co.,* 950 F.2d 294, 302 (6th Cir.1991), *cert. denied,* [— U.S. —] 112 S.Ct. 2941 [119 L.Ed.2d 565] (1992).
>
> In determining whether the district court abused its discretion in denying Commodities and Lubienski's motion for preliminary injunction, we must consider four factors:
>
> 1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;
>
> 2) Whether the plaintiffs have shown irreparable injury;
>
> 3) Whether the issuance of a preliminary injunction would cause substantial harm to others;
>
> 4) Whether the public interest would be served by issuing a preliminary injunction.
>
> *Mason County Medical Ass'n v. Knebel,* 563 F.2d 256, 261 (6th Cir.1977).
>
> Because we hold that Commodities and Lubienski are entitled to intervention as a matter of right, the question of whether they are also entitled to a preliminary injunction must be reconsidered. Therefore, we reverse the district court's decision denying the motion for a preliminary injunction and remand for the court to reconsider this motion in light of our decision granting intervention.

*United States v. Detroit International Bridge Co., et al.,* 7 F.3d 497, 503 (6th Cir. 1993).

Accordingly, pursuant to the Sixth Circuit's directive, this matter is now once again before the Court on the Intervenors' Motion for a Preliminary Injunction.[2]

In this Motion, Commodities and Lubienski seek to enjoin the implementation of the March 28, 1991 GSA–DIBC Memorandum of Agreement ("MOA"). Specifically, the Intervenors *"seek an injunction enjoining the [anticipated] condemnation of lands belonging to the them ... and any interference or tampering with ingress or egress to or from said lands,"* as contemplated in the MOA. [See p. 1 of Intervenors' initial Brief in Support of their Motion for Preliminary Injunction.]

The Court conducted a hearing on the Motion on June 22, 1994. Following the

---

1. Because the Court had determined that Commodities and Lubienski lacked standing to intervene in this action, in the April 3, 1992 Opinion and Order denying Commodities' and Lubienski's motion to intervene, the Court also summarily ordered that the (then) proposed intervenors' motion for preliminary injunction be denied.

2. To the extent that Commodities and Lubienski suggest that the Sixth Circuit made substantive findings regarding their motion for preliminary injunction and "irreparable harm", as the excerpt from the appellate court's opinion demonstrates, such a suggestion is without merit.

hearing, the Court took the matter under advisement and directed the parties to file supplemental briefs on issues raised during oral argument but not fully briefed. All parties subsequently filed several "supplemental" briefs and responses and replies thereto.

Having reviewed and considered all of the briefs and supporting documents submitted in this matter, and having further considered the oral arguments of counsel, the Court is now prepared to rule on the Intervenors' Motion. This Opinion and Order sets forth that ruling.

## II. *PERTINENT FACTS*

### A. *THE PARTIES*

The Detroit International Bridge Company ("DIBC") owns and operates the Ambassador Bridge, which connects Detroit, Michigan with Windsor, Ontario, Canada. Commodities Export Company ("Commodities") operates a "duty-free" shop which is located on a parcel of land on the Detroit side of Ambassador Bridge. Walter Lubienski is the owner of Commodities.

In 1991, DIBC and the United States Government, acting through the General Services Administration (the "GSA"), entered into a Memorandum of Agreement ("MOA") pertaining to the Government's condemnation of property for the expansion of the Ambassador Bridge U.S. Customs inspection facility. Part of the expansion of the customs facility contemplated under the MOA includes an expansion of a truck ramp from the Bridge.

A small portion of the land contemplated to be condemned pursuant to the MOA is owned by Commodities and Lubienski. However, no actual condemnation proceedings have yet been commenced with respect to the Commodities property.

In their Motion for Preliminary Injunction, Commodities and Lubienski seek to preclude the anticipated condemnation of their property. It is Commodities' and Lubienski's belief that the only reason condemnation of their property is being sought is to put Commodities out-of-business.[3] Apparently, Intervenors believe that the contemplated condemnation of Commodities property will be a condemnation of the whole parcel of land on which the duty-free store is located.

The Government, however, has advised the Court that GSA's intentions are *not* to condemn all of Commodities' property. [Plaintiff's July 18, 1994 Supplemental Brief, p. 2.][4] Rather, GSA intends to condemn only a small corner of the duty-free shop's parking lot, in fee, for the expanded truck ramp, and take an additional easement for ingress and egress over the parking lot to a Government parking lot adjoining the Commodities land. *Id.* The easement would be open at all times to Commodities for its own use. [See diagram attached to this Opinion and Order as Exhibit A.]

## III. *DISCUSSION*

As indicated above, the Sixth Circuit has remanded this matter to this Court for reconsideration of Commodities' and Lubienski's Motion for Preliminary Injunction, and has directed that in deciding that matter, the Court is to consider four factors:

---

**3.** Commodities sole competitor in the "duty-free" market in Detroit is Ammex, Inc. Ammex is owned by Manuel J. Moroun. Mouroun is also a 49% shareholder of CenTra, Inc., the holding company which owns DIBC. It is the commonality of principal ownership of DIBC and Ammex by Mr. Moroun which forms the basis of Commodities and Lubienski's belief that the only reason condemnation of their property is sought is to put Commodities out of business. Because DIBC is providing a substantial amount of the funding for the proposed Ambassador Bridge customs facility expansion, Commodities and Lubienski believe that the Government is going to condemn their property and put Commodities out of business for the benefit of DIBC.

**4.** The Intervenors have moved to strike the Government's July 18, 1994 Supplemental Brief because it exceeds the five-page limitation on reply briefs set forth in Local Rule 7.1(d). This Supplemental Brief, however, is not a "Reply Brief"; it is a "Supplemental Brief", filed in accordance with this Court's directives. Further, the Court set no specific page limit for the supplemental briefs it invited the parties to file. For these reasons, Intervenors' Motion to Strike Plaintiff's Supplemental Brief is DENIED.

1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiffs have shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction.

### A. *Likelihood of Success on the Merits*

■ Although it is undisputed that no actual condemnation of Intervenors' property has yet been sought, because Commodities and Lubienski seek to preclude the "contemplated" condemnation of their property, their proof of "likelihood of success on the merits" for purposes of prevailing at this preliminary injunction phase, necessitates a consideration of whether it is likely that they will succeed once condemnation proceedings are instituted.

All parties—the Government, the Bridge Company and the Intervenors—are in agreement that in condemnation proceedings, the inquiry focuses on the satisfaction of two elements:

(1) Is the project which is the object of condemnation "authorized" by Congress; and

(2) Does the project have a "public purpose"?

*See, Berman v. Parker,* 348 U.S. 26, 33–35, 75 S.Ct. 98, 102–104, 99 L.Ed. 27 (1954); *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 240–242, 104 S.Ct. 2321, 2329–2330, 81 L.Ed.2d 186 (1984); *National Railroad Passenger Corp. v. Boston & Maine Corp.,* 503 U.S. 407, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992).

### 1. *Has Condemnation of Intervenors' Property Been Authorized by Congress?*

Commodities and Lubienski's principal argument on the "likelihood of success on the merits" is that there is no legislation authorizing the condemnation of their property, and therefore, they argue that the condemnation of their property is invalid.

The basis for this argument is the intervenors' reading of the three pieces of appropriations legislation dealing with the project for the expansion of the Ambassador Bridge Inspection Facility, i.e., Public Law 100–202, 101 Stat. 1329–401 to 403, Public Law 100–440, 102 Stat. 1732–33, and Public Law 102–393, 106 Stat. 1729, 1751.

In pertinent part, these statutes provide as follows: *Public Law 100–202* (December 22, 1987)

### GENERAL SERVICES ADMINISTRATION

### FEDERAL BUILDINGS FUND

The revenues and collections deposited into the [GSA Federal Buildings Fund] ... shall be available for ... acquisition of buildings and sites by purchase, condemnation, or as otherwise authorized by law ... as follows:

\* \* \* \* \* \*

Michigan:

Detroit, Ambassador Bridge Cargo Inspection Facility, Site, $3,800,000

\* \* \* \* \* \*

Provided ... That all funds for direct construction projects shall expire on September 30, 1989, and remain in the Federal Buildings Fund except funds for projects as to which funds for design or other funds have been obligated in whole or in part prior to that date....

*Public Law 100–440* (September 22, 1988)

### GENERAL SERVICES ADMINISTRATION

### FEDERAL BUILDINGS FUND

The revenues and collections deposited into the [GSA Federal Buildings Fund] ... shall be available for ... acquisition of buildings and sites by purchase, condemnation or as otherwise authorized by law ... as follows:

\* \* \* \* \* \*

Michigan:

Detroit, Ambassador Bridge Cargo Inspection Facility, $10,197,000

\* \* \* \* \* \*

Provided ... That all funds for direct construction projects shall expire on September 30, 1990, and remain in the Federal Buildings Fund except funds for projects as to which design or other funds have been obligated in whole or in part prior to such date.

*Public Law 102–393* (October 6, 1992)

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the following sums are appropriated out of any money in the Treasury not otherwise appropriated ... for certain ... Agencies, for the fiscal year ending September 30, 1993, and for other purposes, namely:

\* \* \* \* \* \*

SEC. 11 (a) Notwithstanding any other provision of law, the General Services Administration is authorized to accept funds from the Detroit International Bridge Company pursuant to a memorandum of agreement dated March 28, 1991, and to deposit such funds into the Fund established under section 210(f) of the Federal Property and Administrative Services Act and further, is authorized to use such funds, in addition to all amounts received pursuant to Public Law 100–202 and Public Law 100–440 as new obligational authority in said Fund, in furtherance of the Ambassador Bridge Cargo Inspection Facility project in Detroit, Michigan.

(b) There are hereby appropriated out of said Fund without limitation as to fiscal year such sums as are received pursuant to subsection (a).

[Intervenors' Ex. H.]

The Intervenors contend that (1) because none of these three statutes say anything about condemning their specific parcel of property, the Court must find that condemnation of their property has not been "authorized by Congress", and (2) even if these three provisions did authorize the taking of their land, that authority has expired. It is the Intervenors position that P.L. 100–202's authority expired on September 30, 1989,

P.L. 100–440's authority expired on September 30, 1990, and P.L. 102–393's authority expired on September 30, 1993.

First, to the extent that Intervenors believe that it is only through P.L. 100–202, 100–440, and/or P.L. 102–393 that condemnation of the property at issue may be found to have been authorized, they are mistaken.

As indicated above, all three of these statutes are appropriations statutes. The Supreme Court and the Sixth Circuit have made clear that, while appropriations acts may provide authority for the GSA to condemn property for a particular purpose, they are not the sole source for such authorization.

In *United States v. Certain Real Estate Lying on the South Side of Broad Street, in the City of of Nashville, Tennessee*, 217 F.2d 920 (6th Cir.1954), the District Court determined that the condemnation of a parcel of land was illegal for lack of Congressional authorization because it was not put to the specific use specified in the appropriations statute. The appropriations statute had authorized the appropriation of funds to construct a new Federal office building in Nashville, Tennessee. However, one tract of land, Tract 14, was not used for the construction project. Rather, after funds were appropriated, the Government changed its mind twice as to how the particular tract should be utilized. First, it was decided that the land should be cleared and used as a parking lot in connection with the new building. That plan was abandoned, and instead, a plan was put into effect whereby the old building that was on Tract 14 was to be remodeled and used by the Government for storage.

The District Court determined that the condemnation of Tract 14 was illegal because the ultimate use of the property decided upon was not authorized by the appropriations act. The Sixth Circuit reversed the District Court's determination, finding sufficient authority for the condemnation of Tract 14 in the "general" condemnation provisions of the Public Buildings Act—the same statute at issue in this case. The Sixth Circuit explained its holding in the *Nashville* case as follows:

[T]he Act of December 28, 1945, [59 Stat. 638],[5] which appropriated funds for the construction of a new Federal Office Building in Nashville places no limitation upon the general authority to condemn property for public use as provided in the [Public Buildings] Act of May 25, 1926, as amended, U.S.C.A., title 40, section 341 [now replaced by the Public Buildings Act of 1959, as amended, 40 U.S.C. § 601, *et seq.*]. Contrary to the District Court's view, this Act is not in our judgment merely procedural, investing the Administrator with the power to condemn only where Congress has appropriated funds for a particular acquisition of property. Authority to condemn must, of course, always have its source in a statute, *Hooe v. United States,* 218 U.S. 322, 335, 336, 31 S.Ct. 85 [89, 89], 54 L.Ed. 1055 [1910]; and where no other Act of Congress vests power to condemn property, an applicable appropriation Act may be looked to as the source of such power. [Citations omitted.] But the authority to condemn is not negatived or affected by the limitations fixed upon costs in the authorization of a Government official to purchase property for a particular use.

\*   \*   \*   \*   \*   \*

In our view, the reasoning of the opinion of the Supreme Court in *United States v. Carmack,* 329 U.S. 230, 236, 242, 243, 247, 67 S.Ct. 252, 254 [257, 258, 260], 91 L.Ed. 209 [1946], leads to the inescapable conclusion that the District Court committed reversible error in the case at bar. There the highest court asserted that both the general Condemnation Act and the Public Buildings Act expressly authorized the acquisition by condemnation of land by the United States as a site for a United States post office, customhouse, or courthouse. General authority to condemn in furtherance of stated programs was conferred; and neither Act imposed expressly any limitation upon the authority of the officials designated by Congress to exercise

the power of condemnation in procuring sites for public buildings deemed necessary to such officials to enable the Government to perform certain specified functions. The opinion writer stated: "... [T]his Court must be slow to read into [these general condemnation] statutes today unexpressed limitations restricting the authority of the very officials named in the Acts as the ones upon whom Congress chose to rely." Authority was found to be vested in the designated officials, by the broad terms of the Public Buildings Act, to select the sites which they chose.... [T]he comparative desirability and necessity for a site were matters for legislative or administrative determination, rather than for a judicial finding.

217 F.2d at 925–926.

■ The *Nashville* case makes clear that there is no requirement of specificity with respect to parcels or uses for a condemnation to be found to have been duly authorized by Congress. The general authority of the Administrator the General Services Administration is sufficient.

Moreover, a simple reading of the three appropriations statutes in question in this case demonstrate the lack of merit in the Intervenors' argument of no authorization for the condemnation of their property.

First of all, the Court notes that Intervenors concede that P.L. 100–202 and P.L. 100–440 contain express powers to condemn. However, they contend that none of the statutes provide any authority for the condemnation of their *particular* parcel of land.

■ The law is settled that an appropriations act need not refer to the specific parcel of land at issue; all that is required is that the project come within the class of expenditures that Congress intended to authorize. *United States v. Right to Use and Occupy 3.38 Acres of Land,* 484 F.2d 1140 (4th Cir. 1973); *United States v. Kennedy,* 278 F.2d 121 (9th Cir.1960).

5.  The Act of December 28, 1945, 59 Stat. 638, provided:
    "Federal office building, Nashville, Tennessee: For the acquisition of a site in Nashville, Tennessee, by purchase, condemnation, or other-

wise, and the construction thereon of a new Federal office building for the use and accommodation of the United States, including the Veterans' Administration, $5,575,000."

In this case, Public Law 102–393 expressly references the MOA, and the MOA specifically deals with the condemnation of a parcel of land which includes Intervenors' property (calling it the "Expanded GSA site").[6] Furthermore, by its terms, P.L. 102–393 incorporates by reference the two earlier appropriations statutes. The express statement of authority in P.L. 102–393 provides that GSA *"is authorized to use such funds, in addition to all amounts received pursuant to Public Law 100–202 and Public Law 100–440* as new obligational authority ... *in furtherance of the Ambassador Bridge Cargo Inspection Facility project in Detroit, Michigan."* Here, P.L. 102–393 authorizes GSA to accept monies from DIBC and *to use such funds as provided in the two earlier pieces of legislation.*

Intervenors further contend that all authority provided in the three statutes has now expired. Intervenors are mistaken. With respect to the first two statutes, P.L. 100–202 and P.L. 100–440, they contain express caveats to the fiscal year 1989 and 1990 expiration dates for any "funds [which] have been obligated in whole or in part prior to that [close of fiscal year expiration] date."[7]

With respect to P.L. 102–393, Intervenors overlook the express provision in Section 11(b) that the authorized appropriation and use of funds paid to GSA by DIBC pursuant to the MOA is *"without limitation as to fiscal year."*[8]

Commodities and Lubienski also argue with respect to "lack of authority" that Congressional condemnation authority is limited to the property described in the Environmental Impact Statement ("EIS") issued in January 1989. Intervenors argue that the condemnation authority granted by Congress to GSA is limited to the property as described in the EIS. Because their property was not included in the January 1989 EIS, Intervenors claim that the condemnation was not authorized.

Again, Intervenors want the Court to ignore the full facts of this matter. In February 1992, a Final Environmental Assessment ("EA") was issued which expressly covers Commodities' and Lubienski's property:

In June 1989, the General Services Administration (GSA) completed an Environmental Impact Statement for the expansion of the present Federal Inspection Facility at Ambassador Bridge, Detroit, Wayne County, Michigan. The expansion was to include acquiring approximately 11 acres of land adjacent to the existing facility.... The boundaries of the expanded facility are 20th Street on the east, Porter Street to the north, Fort Street to the south and the north-south alley between 21st and 22nd Streets that runs parallel to the east side of the Bridge and the Bridge Plaza on the west.

The current proposal that is to be the subject of this Environmental Assessment (EA) is for the GSA to acquire additional parcels of land adjacent to the expanded Ambassador Bridge Customs Inspection Facility. These additional parcels assume an "L" shaped configuration bounded by the south line of the east-west alley north of Porter Street on the north, the west line of the north-south alley between 20th Street and Ste. Anne Street on the east, the west line of 20th and 21st Streets on

---

**6.** The "Expanded GSA Site" is defined in the MOA as "an area including the GSA site (which was previously condemned property) and *additional land to the north and east of the GSA site."*

**7.** With respect to P.L. 100–202, Intervenors completely ignore the fact that this statute deals only with "site" acquisition *not* "direct construction". It is only appropriations for "direct construction" projects that expired at the end of the fiscal year. (The Court notes that the Ambassador Bridge project was not the only project covered in P.L. 100–202 and 100–440; numerous other projects, some of which were "site" acquisitions, some were "design" projects, and some were "construction" projects.)

**8.** To the extent that Commodities and Lubienski rely on the Government's "change of position" with respect to the configuration of the Bridge off ramp since former U.S. Attorney Steven Markman's involvement in the matter, as the Sixth Circuit found in *Gibson & Perin Co. v. City of Cincinnati,* 480 F.2d 936 (6th Cir.1973), *cert. denied* 414 U.S. 1068, 94 S.Ct. 577, 38 L.Ed.2d 473 (1973) there is no requirement that aggrieved landowners be given notice of a change of boundaries of land to be condemned, even if the change in boundaries is decided upon after the condemnation has been approved by the appropriate authorities.

the west and the north line of Fort Street on the south. This acquisition will permit a redesign of the proposed facility including the construction of two bridge lanes for commercial vehicles that come directly off the Bridge without passing through the existing bridge plaza and the potential to expand the number of inspection booths from six to nine.

\*      \*      \*      \*      \*      \*

*[T]he proposed project is a modification of an approved development....* Other adjustments to the boundaries also were examined and found not to be reasonable alternatives, ***including the plans submitted by Commodities Export Company*** *as design options that would avoid the site of a duty-free store owned by the company to the north of Porter....*

[Intervenors' Ex. J.; DIBC Reply Brief Ex. E.]

The foregoing belies Intervenors' contention that, but for this preliminary injunction action, they have had no opportunity to be heard with respect to the Bridge expansion and the attendant condemnation of their land contemplated by the MOA.

■ Furthermore, even if no EIS or EA had been performed, this would not defeat the Government's right to condemn. Intervenors' argument predicated upon the lack of

an EIS addressing their parcel of property is the same one made and rejected by the Ninth Circuit in *United States v. 0.95 Acres of Land,* 994 F.2d 696 (9th Cir.1993). In that case, the court held:

> NEPA cannot be used as a defense to the condemnation action. The filing of a condemnation action and the subsequent transfer of legal title are not "major Federal actions significantly affecting the environment."

*Id.* at 699.

The Ninth Circuit went on to note that once the condemnation and transfer of title has occurred, NEPA might be applicable, however ***the environmental statute has no impact whatsoever on the sovereign power to condemn.*** *Id. See also, United States v. 255.25 Acres of Land,* 553 F.2d 571 (8th Cir.1977); *United States v. 178.15 Acres of Land,* 543 F.2d 1391 (4th Cir.1976).

The foregoing makes clear that there is no legal merit to Commodities' and Lubienski's argument that condemnation of their property was not "authorized" by Congress.[9]

### 2. *Does the Ambassador Bridge Expansion Project Have a "Public Purpose"?*

There appears to be no contest that the construction and improvement of federal government facilities or public roads and bridges

---

9. Intervenors misrepresent in their Brief that the Sixth Circuit established the "law-of-the-case" and held in its October 12, 1993 Opinion that condemnation of their property would be neither "necessary" nor "fair". This is a mischaracterization of the Sixth Circuit decision on this matter. As indicated above, the Sixth Circuit took *no position* whatsoever regarding the merits of Intervenors motion for preliminary injunction. With respect to any discussion of "fairness", all that the Sixth Circuit stated was that Commodities and Lubienski should be allowed to intervene as of right because they "would be unfairly disadvantaged if their land is condemned by the United States before being given the opportunity to assert their interests in this matter." 7 F.3d at 501.

Furthermore, with respect to any argument that the Court should review the necessity of the proposed condemnation, such judicial review is precluded under applicable law. As the Supreme Court held in *United States ex. rel. TVA v. Welch,* 327 U.S. 546, 557, 66 S.Ct. 715, 90 L.Ed. 843 (1946),

> Once it is admitted or judicially determined that a proposed condemnation is for a public

purpose and within the statutory authority, *a political or judicially non-reviewable question may emerge, to wit, the necessity or expediency of the condemnation of the particular property.* (Emphasis added.)

To the extent that Intervenors rely upon the Sixth Circuit's suggestion at 7 F.3d at 501 that Commodities and Lubienski by intervening to assert their interests in this matter they would be entitled to "a hearing on questions relating to necessity and expediency", *id., citing Bragg v. Weaver,* 251 U.S. 57, 58, 40 S.Ct. 62, 63, 64 L.Ed. 135 (1919), any reliance upon *Bragg* would be misplaced. In *Bragg,* the Supreme Court held only that the owner of property has a right to be heard on the issue of *just compensation,* but that once the public purpose for the taking is established, the questions of necessity and expediency are for the government to determine, *not* the courts. *Id.*

A discussion of the "public purpose" of the project follows in the next section of this Opinion and Order.

constitutes a "public purpose." *See, e.g., Rindge Co. v. County of Los Angeles,* 262 U.S. 700, 706, 43 S.Ct. 689, 692, 67 L.Ed. 1186 (1923) ("that a taking of property for a highway is a taking for public use has been universally recognized."); *Luxton v. North River Bridge Co.,* 153 U.S. 525, 530, 14 S.Ct. 891, 892, 38 L.Ed. 808 (1894) (Congress "may, at its discretion use its sovereign powers, directly or through a corporation created for that object, to construct bridges for the accommodation of interstate commerce.")

The "public purpose" question arises in this case because the MOA contemplates that the Government will take the Intervenors' land by condemnation, and the funding for the Government's acquisition will be provided by the DIBC. Case law demonstrates, however, that the contemplated involvement of the DIBC does not alter the public purpose of the project.

*Berman v. Parker,* 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), involved condemnations for an urban renewal project in the District of Columbia. The land condemned by the Government was to be transferred to a private developer who would oversee the redevelopment of the area. The aggrieved condemnee in *Berman* was the owner of a department store that was not a blighted property which was located somewhat beyond the blighted area. He challenged the constitutionality of the taking of his property, arguing as the Intervenors do here, that there was no necessity to take his property to achieve the goals of the project. He also argued that there was no public use involved since his property was to be transferred to another private owner.

Both arguments were rejected by the Supreme Court. With respect to using a private enterprise to accomplish a public purpose the *Berman* court stated:

> We cannot say that public ownership is the sole method of promoting the public purpose ... [this] also disposes of any contention concerning the fact that certain property owners in the area may be permitted to repurchase their properties for redevelopment in harmony with the overall plan. That, too, is a legitimate means which Con-

gress and its agencies may adopt, if they choose.

348 U.S. at 34, 75 S.Ct. at 103.

The "public purpose/private enterprise" issue was revisited by the Supreme Court in *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984). In *Midkiff,* the condemnees challenged the constitutionality of the Hawaii Land Reform Act of 1967 which provided for redistribution of large blocks of privately owned land by condemnation.

The Ninth Circuit struck down the Act finding it to be "a naked attempt on the part of the state of Hawaii to take private property of A and transfer it to B solely for B's private use and benefit." The Supreme Court disagreed. Quoting on *Berman, supra,* the *Midkiff* court stated:

> Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine once the public purpose has been established.
>
> \*      \*      \*      \*      \*      \*
>
> In short, the Court has made clear that it will not substitute its judgment for a legislative judgment as to what constitutes a public use unless the use be palpably without reasonable foundation.

467 U.S. at 240–241, 104 S.Ct. at 2329.

Most recently, the Supreme Court faced the public use/private enterprise involvement issue in *National Railroad Passenger Corp. v. Boston and Maine Corp.,* 503 U.S. 407, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992). In that case, as in *Berman, Midkiff,* the aggrieved landowners argued that the taking of their property was not for a public use but rather

for the benefit of a private owner. The Court once again rejected this argument and unequivocally stated, "[T]he Court will not strike down a condemnation on the basis that it lacks a public use *so long as the taking is rationally related to a conceivable public purpose.*" —— U.S. at ——, 112 S.Ct. at 1404.[10]

For all of the foregoing reasons, the Court finds that Commodities and Lubienski have not established a "likelihood of success on the merits" so as to entitle them to the preliminary injunctive relief they seek.

## B. *No Irreparable Harm*

Because Intervenors cannot establish a likelihood of success on the merits, it is unnecessary to discuss the other preliminary injunction elements. Even though it is unnecessary to proceed with a discussion of the remaining requirements, it is clear to the Court that Commodities and Lubienski cannot satisfy them, either.

With respect to the "irreparable harm" requirement, Intervenors appear to rely solely upon the Sixth Circuit's October 1993 Opinion regarding their right to intervene in this action as they argue at page 13 of their Brief that the Court of Appeals has already decided that the condemnation of their property will cause irreparable injury. As explained above, contrary to Intervenors' assertions, the appellate court did *not* decide the merits of Intervenors' request for injunctive relief. Rather, the Court merely questioned Commodities' and Lubienski's ability to protect their interest absent intervention in the action.

■ Moreover, it is well-established that injunctive relief is not available to bar a taking of private property for public use *because compensation (i.e., payment of fair market value) is available. See Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1016, 104 S.Ct. 2862, 2879, 81 L.Ed.2d 815 (1984); *Glosemeyer v. Missouri–Kansas–Texas Railroad,* 879 F.2d 316, 326 (8th Cir.1989), *cert. denied,* 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990).

### 3. *Harm to Others*

The third element which must be satisfied in order to obtain preliminary injunctive relief is establishing that if the injunction were to issue, it would not cause substantial harm to others. *International Resources, Inc. v. New York Life Ins. Co.,* 950 F.2d 294 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2941, 119 L.Ed.2d 565 (1992).

It is unquestionable that the Government, DIBC, and the public at-large would be substantially harmed if the Court were to grant the injunctive relief requested by Intervenors. Already millions of dollars have been expended by the Government and DIBC, including millions of dollars of taxpayer money, which would be "wasted". Moreover, to block the condemnation of the small portion of Commodities property at issue here would further delay what has already become a long-delayed project.

### 4. *Public Interest*

Intervenors' only argument that the public interest would be advanced by the issuance of the injunction they seek is that "duty-free monopoly is not in the best interests of the public", and the injunction they want would keep them in business and avoid such a monopoly. As indicated above in this Opinion and Order, however, the Government has represented that it only intends to condemn, in fee, a small portion of Commodities Export's parking lot and take an easement over the parking lot for ingress and egress to adjoining property. It is *not* going to put Commodities out-of-business so as to create a "duty-free monopoly".

■ Furthermore, *Berman* and its progeny establish that when Congress has autho-

---

**10.** To the extent that Commodities and Lubienski persist in their argument that the stated public purpose of the Bridge project is a sham and a cover-up for the purpose of putting Commodities out of business (to benefit its duty-free shop competitor, Ammex, Inc.), Commodities have come forward with no hard evidence to substantiate their wholly speculative allegations. Moreover, courts have held that in the absence of proof of egregious bad faith or fraud, it is not for the courts to consider broadside allegations that the purported public use to be served is merely a pretense or sham to cover arbitrary action. *See, e.g., United States v. 416.81 Acres of Land,* 514 F.2d 627 (7th Cir.1975).

rized a taking, it has already determined the public interest and courts are not to second-guess that determination. As the Supreme Court stated in *Berman*, "[W]hen the legislature has spoken, the public interest has been declared in terms well-nigh conclusive." 348 U.S. at 32, 75 S.Ct. at 102.[11]

### CONCLUSION

For all of the foregoing reasons, the Court finds that Intervenors Commodities Export Company and Walter H. Lubienski have failed to satisfy the requirements for preliminary injunctive relief to preclude the Government from going forward with the condemnation of the Intervenors' property. Accordingly,

IT IS HEREBY ORDERED that Intervenors Commodities Export Company and Walter Lubienski's Motion for Preliminary Injunction be, and hereby is, DENIED.

11. Moreover, it can hardly be said that a greater public interest would be served by maintaining a duty-free store than by the construction of a safe and efficient Federal inspection facility at the heavily trafficked Ambassador Bridge. .

EXHIBIT A

BROWN AND CARLSON, INC.
CIVIL ENGINEERS & SURVEYORS
ONE JOHN R ST. 3rd Flr.
DETROIT, MICHIGAN 48226
(313) 961-3411

| | |
|---|---|
| SCALE: | 1" = 30' |
| DATE: | 01-27-94 |
| JOB No. | S-36365-D |

SHEET 1

REV: 3-31-94 PER 13A