UNITED STATES of America,
Plaintiff,

v.

CERTAIN LAND SITUATED IN THE
CITY OF DETROIT, WAYNE COUN-
TY, MICHIGAN; Detroit Internation-
al Bridge Company; Commodities
Export Company; and Walter H. Lu-
bienski, Defendants.

and

United States of America, Plaintiff,

v.

0.074 Acre Of Land, More or Less, Situ-
ated in the City of Detroit, Wayne
County, Michigan and Commodities
Export, Inc., et al., Defendants.

Nos. 79–CV–73934–DT,
96–CV–75495–DT.

United States District Court,
E.D. Michigan,
Southern Division.

March 24, 1999.

Donald F. Rosendorf, Washington, D.C., for plaintiff.

Walter H. Lubienski, Rogert E. Craig, Dearborn, Naples, FL, for defendant.

*OPINION AND ORDER REGARDING THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT/DISMISSAL (IN CASE NO. 79–73934), AND DEFENDANTS' MOTION (IN CASE NO. 96–75495) TO DISMISS COMPLAINT AND VACATE DECLARATION OF TAKING*

ROSEN, District Judge.

## I. INTRODUCTION

This matter is presently before the Court on four dispositive Motions:

1) Commodities Export Company and Walter H. Lubienski's "Motion for Summary Judgment and for Permanent Injunction or Alternately for Preliminary Injunction";

2) the Government's Cross–Motion for Summary Judgment;

3) DIBC's [the Detroit International Bridge Company's] Cross–Motion for Summary Judgment;[1] and

4) Commodities Export Company's and Walter Lubienski's Motion to Dismiss Complaint and Vacate Declaration of Taking in Case No. 96–76495.[2]

Responses and Reply Briefs have been filed with respect to these Motions. The parties have also filed Supplemental Briefs pursuant to the Court's directive at the close of the hearing held on October 15, 1998.

Having reviewed and considered the parties' respective motions and briefs, and having heard the oral arguments of counsel, the Court is now prepared to rule on this matter. This Opinion and Orders sets forth the Court's ruling.

## II. PERTINENT FACTS AND PROCEDURAL HISTORY

This matter has a long, protracted history. To briefly summarize, in 1979, the United States initiated an eminent domain action (the "1979 action") to acquire certain lands from the Detroit International Bridge Company ("DIBC") for a project to expand the U.S. Customs Cargo Inspection facility on the American side of De-troit's Ambassador Bridge. The Ambassador Bridge is owned by DIBC.

In an effort to resolve the 1979 action, on March 29, 1991 the United States Government, acting through the General Services Administration ("GSA"), and DIBC entered into a Memorandum of Agreement ("MOA") regarding the condemnation of property for the expansion of the Customs facility. The MOA was approved by the Justice Department on April 30, 1992.

Part of the expansion contemplated under the MOA includes the expansion of a truck ramp from the Bridge to the Cargo Inspection facility. It is the expansion of the truck ramp from the Bridge to the Cargo Inspection facility which is at the heart of the present dispute involving Commodities Export Company ("Commodities") and Walter Lubienski.[3]

A small portion of the land contemplated to be condemned pursuant to the MOA is owned by Commodities and Lubienski. Commodities operates a "duty free" shop located on the Detroit side of the Ambassador Bridge near the proposed expanded truck ramp. Walter Lubienski is the owner of Commodities. Condemnation complaints for the taking of Commodities and Lubienski's property were filed in December 1996.

The condemnation proceedings against Commodities' property consists of the taking in fee of a corner of Commodities' parking lot to complete the ramp off the Bridge, and the taking of an easement across Commodities' parking lot for access to a to-be-constructed government parking

---

**1.** DIBC has also filed a motion to dismiss the Intervenor–Defendants' claims in which the Government has joined. This motion to dismiss raises the same arguments raised in the parties' Motions/Cross–Motions for Summary Judgment. Therefore, the Court's decision on the Motions for Summary Judgment as set forth in this Opinion and Order also serves as its ruling on DIBC's motion to dismiss.

**2.** The Court previously dismissed Defendants' Motion to Dismiss without prejudice to Defendants' right to renew this motion after the close of discovery. Although no formal notice of renewal has been filed, inasmuch as the Motion to Dismiss incorporates by reference and is intertwined with Defendants' Motion for Summary Judgment, the Court presumes that Defendants wish to renew their dismissal motion. Therefore, the Court will address this motion along with the Motions/Cross–Motions for Summary Judgment.

**3.** Commodities and Lubienski are sometimes collectively referred to in this Opinion and Order as the "Intervenor–Defendants" or the "Intervenors".

lot on adjacent property. The easement will be open at all times to Commodities for its own use. *See* diagram attached to the Government's Complaint in 96–CV–75495–DT. The taking in fee of the corner of Commodities' parking lot and the easement over Commodities' property together constitute less than 0.1 acre of land.[4]

Commodities and Lubienski moved to intervene in the 1979 action in December 1991, prior to the initiation of condemnation proceedings against their property, in order to block, by way of preliminary injunction, the implementation of the MOA. The Court denied the motion to intervene finding that Commodities and Lubienski lacked standing to intervene in this case. *See U.S. v. Certain Land,* No. 79–CV–73934–DT, April 3, 1992 Opinion and Order. The Court also summarily denied Commodities and Lubienski's motion for preliminary injunction. *Id.*

On October 12, 1993, the Sixth Circuit reversed this Court's decision denying the motion to intervene holding that Commodities and Lubienski were entitled to intervention as a matter of right. *See, United States v. Detroit International Bridge Co., et al.,* 7 F.3d 497 (6th Cir.1993). In so doing, however, the Court of Appeals made no determination and no findings with respect to the Intervenor–Defendants' proposed motion for preliminary injunction.

On remand, Commodities and Lubienski renewed their motion for a preliminary injunction to enjoin the implementation of the MOA and more specifically, to enjoin the condemnation of their property, argu-

ing that the MOA is invalid (1) because there is no legislation authorizing the condemnation of their property[5] and (2) because the MOA calls for DIBC, a private entity, to fund the contemplated acquisition of their property, the project had no "public purpose." With respect to this "lack of public purpose" argument, the Intervenors also argued that the stated public purpose of the project is a sham and a cover-up for the purpose of putting Commodities out of business, to the benefit of its sole competitor in the duty-free market in Detroit, Ammex, Inc., which shares a commonality of principal ownership with DIBC.

This Court thoroughly analyzed the Intervenors' arguments in its Opinion and Order of December 30, 1994, *see United States v. Certain Land Situated in the City of Detroit,* 873 F.Supp. 1050 (E.D.Mich.1994), and found no legal merit in any of them. The Court, therefore, concluded that the Intervenor–Defendants failed to establish a likelihood of success on the merits. *Id.* at 1059. The Court also determined that the Intervenors failed to establish that the contemplated implementation of the MOA or the condemnation of their property would result in irreparable harm to them or harm to others. *Id.* The Court further determined that the Intervenors failed to show that the public interest would be advanced by the issuance of the injunction they sought. *Id.* at 1059–60. Therefore, the Court denied Commodities' and Lubienski's motion for preliminary injunction. *Id.* at 1060.

---

4. Lubienski also owns five vacant lots adjacent to the Commodities duty free shop property which constitute approximately 0.41 acre of land. The Government has filed a separate condemnation action for the taking of Lubienski's five vacant lots for the to-be-constructed parking lot for government employees. See Eastern District of Michigan No. 96–CV–75494–DT. Although the Government's Complaint in Condemnation in case number 96–75494 was filed in December 1996, there is nothing of record indicating that service of process in this action was ever effected.

5. With respect to their "lack of congressional authorization" argument, Commodities and Lubienski argued the three pieces of appropriations legislation dealing with the project—i.e., Public Law 100–202, 101 Stat. 1329–401 to 403, Public Law 100–440, 102 Stat. 1732–33, and Public Law 102–393, 106 Stat. 1729, 1751—did not provide authorization for the condemnation of their property because none of the three statutes say anything about condemning their specific parcels of land and even if they did authorize the taking of their land, that authority has expired.

Commodities and Lubienski subsequently appealed this Court's denial of their motion for preliminary injunction to the Sixth Circuit Court of Appeals. On January 23, 1996, in an unpublished opinion, the Sixth Circuit agreed with this Court's conclusion that the Intervenors were not entitled to a preliminary injunction and affirmed the Court's order "for the reasons stated by the [district] court in its opinion dated December 30, 1994." *United States v. Certain Land Situated in the City of Detroit*, 76 F.3d 380, 1996 WL 26915 (6th Cir.1996) (unpublished decision, text available on WESTLAW) Although the Intervenors attempted to raise before the appellate court one of the arguments they now assert here—to wit, that the MOA is invalid because it was the product of "improper collusion"—the Court of Appeals made no findings with respect to that argument and made clear that the only issue before it was whether the district court properly denied the motion for preliminary injunction. *Id.*[6]

Commodities and Lubienski subsequently filed a petition for a writ of certiorari before the United States Supreme Court. The Supreme Court denied that petition on October 7, 1996. *See Commodities Export Company v. United States*, 519 U.S. 819, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996).

The case was then remanded to this Court once again. Upon remand, on December 6, 1996, the Government filed two complaints for the specific condemnation of Lubienski's and Commodities' property.[7] With the Commodities/Lubienski condemnation complaints having been filed, on December 12, 1996, the Court conducted a status conference with counsel for all parties. At that conference, the parties requested to conduct discovery on the Intervenor–Defendants "improper collusion" claim. The Court granted that request and gave the parties until the end of June 1997 to conduct their requested discovery.[8] At that conference, all counsel were in agreement that Commodities and Lubienski could raise their "improper collusion"/invalidity of the MOA arguments in the condemnation actions for the condemnation of their particular parcels of property and, therefore, their participation in the 1979 case was no longer necessary. The parties, therefore, agreed to submit a Stipulation and Order agreeing to Commodities' and Lubienski's dismissal from the 1979 action. (Commodities and Lubienski subsequently reneged on this agreement and refused to stipulate to being dismissed from the 1979 action.)

Meanwhile, the re-assignment of the Commodities/Lubienski condemnation complaints to this Court was put at issue. As noted above, although the complaints were originally assigned to other judges, they were re-assigned to this Court pursuant to the "companion case rule" set forth in Eastern District of Michigan Local Rule 83.11. In January 1997, Commodities and Lubienski challenged this Court's jurisdiction to hear the two 1996 condemnation actions under the companion case rule and moved to disqualify the Court. This matter was referred to United States Magistrate Judge Thomas A. Carlson for hearing and recommendation. Upon the

---

6. The Sixth Circuit noted that this Court found that the Intervenors' "improper collusion" argument was based upon nothing more than "speculative allegations" and that Commodities and Lubienski had failed to come forward with any hard evidence to substantiate their wholly speculative allegations. *Id.* at —— 1, n. 1. The appellate court stated, however, that failure of the Intervenors to present evidence of collusion in support of their motion for preliminary injunction did not amount to a waiver of the collusion argument at a later stage in the litigation. *Id.*

7. These cases, 96–CV–75494 and 96–CV–75495, were originally assigned through the random draw to other judges of this Court. Pursuant to LR 83.11, these cases were reassigned to this Court as companion cases to the 1979 action.

8. This deadline was subsequently extended into 1998 at the parties' request.

Report and Recommendation of the Magistrate Judge, on September 30, 1997 this Court denied the Intervenors' disqualification motion. Commodities and Lubienski subsequently challenged the denial of their jurisdictional motions and their motion to disqualify in a Petition for a Writ of Mandamus filed before the Sixth Circuit Court of Appeals on December 15, 1997. On February 9, 1998, the Sixth Circuit issued its Order denying the Mandamus Petition. Commodities then filed a Motion for Rehearing in the appellate court. That Motion was denied on March 2, 1998 and a Mandate returning the case to this Court was issued on March 13, 1998.

Meanwhile, during the pendency of the Mandamus Petition, in June 1997, Commodities and Lubienski filed the present "Motion for Summary Judgment and for Permanent Injunction or Alternately for Preliminary Injunction" and then subsequently filed a separate Motion to Dismiss the Government's Condemnation Complaint against their property in Case No. 96–75495. The United States and DIBC responded to the Intervenor–Defendants' Motions and filed their own "Cross–Motions for Summary Judgment". The Court stayed consideration of these dispositive motions during the pendency of the Mandamus Petition.

After the Sixth Circuit ruled on the Mandamus Petition which settled the issue of this Court's jurisdiction, on March 28, 1998, upon the request of the Intervenor–Defendants, the Court modified the previously set Scheduling Order and extended discovery in the 1996 cases for an additional two months. At the same time, because it determined that discovery could impact upon Commodities and Lubienski's previously filed Motion to Dismiss, the Court dismissed that motion without prejudice to the Defendants' right to renew that motion after the close of discovery.

Discovery has now closed and the dispositive motions are, therefore, now ripe for resolution. The Court will first address Commodities and Lubienski's Motion and the Government's and DIBC's Cross–Motions for Summary Judgment concerning the validity of the MOA, and then will address Commodities' and Lubienski's separately filed Motion to Dismiss the Condemnation Complaint in Case No. 96–75495.

III. *SUMMARY JUDGMENT MOTIONS ON THE 1979 CASE: VALIDITY OF THE MOA*

A. SUMMARY OF ARGUMENTS

Intervenor/Defendants Commodities Export and Walter Lubienski seek a summary judgment ruling that the MOA (as well as the condemnation of their property contemplated thereunder) is invalid and the product of improper collusion between the Government and DIBC. The Government and DIBC take the contrary position—i.e., that the MOA is valid and should be approved by the Court.

In their written Motion and Brief for Summary Judgment and for Permanent Injunction, Commodities and Lubienski presented four principal arguments in furtherance of their contention that the MOA is invalid. First, they argued that because the Ambassador Bridge is a privately-owned bridge, under Michigan statutory law, the use of public funds as contemplated in this case for any construction/improvements in connection with the bridge is prohibited. Because the improvements to the Customs facility and approaches to and from the Bridge to the Customs facility contemplated under the MOA are, for the most part, being financed with public funds, implementation of the MOA would be against the law—and, hence, the Agreement should be declared invalid.

Second, the Intervenors argued that the condemnation of their property as contemplated under the MOA (and now actually sought in separately-filed actions) is improper and must be declared invalid because (1) there has been no approval of the MOA by the Attorney General and (2) the Court is required to ratify the MOA before

any condemnation action against their property can be initiated.

Third, Commodities and Lubienski argued that the MOA is subject to the Federal Highway Act and since it is not in compliance with that Act, the MOA must be found to lack legislative authority and be declared invalid.

Fourth, the Intervenor–Defendants argued that the MOA must be declared to be invalid because it is the product of improper collusion between the Government and DIBC.

At oral argument, Intervenors presented yet a fifth argument, which, as of the date of the hearing (October 15, 1998), had not been briefed. They argued that because DIBC and the Government have not come to an agreement on an "Approved Plan", as that term is defined in the MOA, any authority granted or action taken "pursuant to the MOA"—including the statutory authorization for GSA to accept funds from DIBC as set forth in P.L. 102–393 and the authority for the condemnation of Intervenors' property as set forth in Schedule A to the Government's 1996 Complaint for Condemnation—is null and void. It is the Intervenors' position that the MOA requires that there be an "Approved Plan" before there can be any condemnation of property in connection with the Ambassador Bridge/customs facility project within the site area contemplated under the MOA.

Because Intervenors presented this argument for the first time at the hearing held in October 1998, the Court directed the parties to file supplemental briefs on the issue.[9] The parties have complied with the Court's directive.

Since Intervenors at oral argument characterized their "no Approved Plan" ar-

gument as their "longest and strongest," the Court will address this last argument first.

## B. DISCUSSION

### 1. STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[10] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

9. Specifically, the Court directed the parties to brief, with legal authority, the argument raised by Intervenors that the language of P.L. 102–393 requires approval of the parties of an Approved Plan in order to permit the Government to take money from DIBC.

10. "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association*, 78 F.3d 1079 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). The Court will apply the foregoing standards in deciding the Motions/Cross–Motions for Summary Judgment in this case.

2. *P.L. 102–393 DOES NOT REQUIRE THAT GSA AND DIBC HAVE AGREED UPON AN "APPROVED PLAN" BEFORE THE GOVERNMENT MAY ACCEPT MONEY FROM DIBC AS CONTEMPLATED UNDER THE MOA OR CONDEMN COMMODITIES' PROPERTY.*

■ Intervenors argue that because DIBC and the Government have not come to an agreement on an "Approved Plan", as that term is defined in the MOA, the statutory authorization in P.L. 102–393 for GSA to accept funds from DIBC "pursuant to the MOA" and the Government's attendant authority for the condemnation of Intervenors' property—is null and void. It is the Intervenors' position that the MOA requires that there be an "Approved Plan" before there can be any condemnation of property in connection with the Ambassador Bridge/customs facility project within the site area contemplated under the MOA.

Public Law 102–393 provides as follows:

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the following sums are appropriated out of any money in the Treasury not otherwise appropriated... for certain... Agencies, for the fiscal year ending September 30, 1993, and for other purposes, namely:

*       *       *       *       *       *

SEC. 11 (a) Notwithstanding any other provision of law, *the General Services Administration is authorized to accept funds from the Detroit International Bridge Company **pursuant to a memorandum of agreement dated March 28, 1991** [i.e., the "MOA"], and to deposit such funds into the Fund established under section 210(f) of the Federal Property and Administrative Services Act and further, is authorized to use such funds, in addition to all amounts received pursuant to Public Law 100–202 and Public Law 100–440 as new obligational authority in said Fund, in furtherance of the Ambassador Bridge Cargo Inspection Facility project in Detroit, Michigan.

(b) There are hereby appropriated out of said Fund without limitation as to fiscal year such sums as are received pursuant to subsection (a).

Intervenors argue that since the dictionary definition of the phrase *"pursuant to"* is *"according to"* or *"in accordance or conformance with,"* implicit in the statutory authorization granted to GSA to accept funds from DIBC (and to condemn Intervenors' property) "pursuant to the MOA" is a precondition that GSA and DIBC must have first agreed upon an "Approved Plan," as that term is defined in the MOA.

The MOA defines "Approved Plan" as

the plan to be developed by GSA and acceptable to DIBC under the terms and conditions of this Agreement. *The Approved Plan shall incorporate land within the Expanded GSA Site* and provide for an enlarged Federal clearance facility.

[MOA Section 1.9 (emphasis added)]

"Expanded GSA Site" is defined in the MOA as

an area including the GSA Site [11] and *additional land to the north and east of the GSA Site as set forth on the Approved Plan*. Acquisition by GSA of the Expanded GSA Site represents the extent of GSA's land acquisition under the terms of this Agreement. It is the intention of the parties that future modification(s) of the Federally-owned clearance facilities shall occur within the boundaries of the Expanded GSA Site.

[MOA Section 1.2 (emphasis added)]

Intervenors' argument is a series of inferences. First, they argue that since the Government only has statutory authority to accept funds from DIBC "pursuant to the MOA," absent an "Approved Plan," there is no "Expanded GSA Site." They then postulate that since Intervenors' property, is situated "to the north and east of the GSA Site"—and would, therefore, be within what would be the MOA's "Expanded GSA Site"—if the Government does not have DIBC's agreement to the Expanded GSA Site's boundaries or the specific property comprising the Expanded Site, it cannot be deemed to have authority under P.L. 102–393 to accept funds from DIBC for land acquisition within the Expanded GSA Site and/or to condemn Intervenors' property.

The Court finds no merit in this rather attenuated argument for several reasons. First, there is nothing within the plain language of P.L. 102–393 requiring as a precondition to GSA's acceptance of funds from DIBC that there be a definitive "Approved Plan" in place and the parties have not referred the Court to, nor has the Court independently found, any legislative history of the statute from which such a required precondition may be inferred.

Second, and perhaps more importantly, the MOA itself makes clear that the "Approved Plan" term is a flexible one. Section IV of the Agreement, which is captioned "Approved Plan Development," requires only that

GSA agree[ ] to embark upon *the development* of an Approved Plan acceptable to DIBC in an effort to complete contract documents *suitable for construction pricing* by May 31, 1991.

[MOA, Section 4.1 (emphasis added)]

Section IV continues, in pertinent part:

It is agreed that the design development of this plan will:

(4.1.1) allow provisions for structural support of a new bridge span within the primary inspection lanes area...; [and]

(4.1.2) *provide for further improvements of the entry ramp and geometrics, by the inclusion of additional land* ....

*Id.*

Of particular significance with respect to Intervenors' argument is Section 4.2 of MOA which explicitly provides:

**In the course of the implementation of this Agreement, there may be one** *or more Approved Plans,* **developed by**

---

**11.** The "GSA Site" is the specific area of land on which the new Federal Customs clearance facility is to be constructed.

GSA and acceptable to DIBC, to implement the provisions of various sections of this Agreement.

[MOA, Section 4.2 (emphasis added).]

Section 4.2 makes clear that there is no requirement under the MOA of one single, global "Approved Plan" delimiting the boundaries and specific property comprising the entire "Expanded GSA Site". Rather, the Agreement clearly that there may be several Approved Plans developed by the Government and agreed upon by DIBC over a period of time.

Moreover, Section 8.5.2 contains an express provision concerning the effect of the parties' failure to agree upon the provisions to be included in the Approved Plan. In pertinent part, that Section provides:

In the event the parties cannot agree upon the provisions to be included in the Approved Plan by June 30, 1991, it is agreed that the parties will cooperate in good faith with the chairperson of the Urban Planning Department of Michigan State University or his/her designee serving in the capacity of a mediator in an effort to come to an agreement on the Approved Plan.... Subject to the above, if GSA and DIBC fail to develop an Approved Plan satisfactory to both parties by January 1, 1992, *the terms and conditions of this Agreement yet to be implemented* shall be rendered null and void, unless this Agreement is extended by the mutual consent of the parties....

[MOA, Section 8.5.2 (emphasis added).]

Clearly, the MOA contemplates that a global Approved Plan might not be in place before implementation of the MOA is commenced.

This Court, accordingly, does not construe P.L. 102–393 as requiring, as a precondition for authorization for GSA to accept funds from DIBC "pursuant to the MOA," that GSA and DIBC have agreed upon an Approved Plan delimiting all property within the Expanded GSA Site. Rather, the Court construes the acceptance of funds "pursuant to the MOA" language as meaning merely that DIBC's payment of funds to GSA is to be made in the manner provided in Sections 6.1.3 and 6.1.4 of the Agreement. These sections state, in pertinent part, as follows:

(6.1.3) DIBC agrees to compensate GSA and make GSA "whole" for all Incremental Costs incident to and arising out of revisions to the proposed Federal Project ....[12]

\*      \*      \*      \*      \*      .\*

(6.1.4) ... Requests for payment of Incremental Costs, together with appropriate supporting documentation, shall be forwarded by GSA to DIBC.... If any irregularities with respect to such requests are noted by DIBC, DIBC shall promptly notify GSA. DIBC shall deposit, or cause to be deposited, to an escrow or Treasury account as directed by GSA, sufficient funds to cover the invoices within ten (10) days of DIBC's receipt of said invoices.... [A]ny noted irregularity... shall ... become the subject of future negotiations between GSA and DIBC.

[MOA, Sections 6.1.3–6.1.4.][13]

For all of the foregoing reasons, the Court finds no merit in Intervenors' "lack

---

**12.** "Incremental Costs" are delineated as (1) costs related to the completion of a Supplemental Environmental Impact Statement [§ 6.1.3.1]; (2) property acquisition costs [§ 6.1.3.2]; and (3) contractual design and construction costs [§ 6.1.3.3].

**13.** To the extent that in making their "not pursuant to the MOA" argument Intervenors are arguing that the Government lacks au-

thority under P.L. 102–393 to condemn their property because GSA and DIBC have not agreed upon an Approved Plan, both the Government and DIBC stated on the record on October 15, 1998 that if the Government and DIBC disagreed on the property to be acquired (which appears to be the disagreement here), all that would happen is that DIBC would refuse to pay for the acquisition. As

of authority" argument with respect to P.L. 102–393 and the lack of an Approved Plan.

### 3. THE MICHIGAN STATE BRIDGE STATUTE IS INAPPLICABLE TO THIS ACTION

■ Intervenors also argue that because the Ambassador Bridge is a privately-owned bridge, under Michigan statutory law, the use of public funds as contemplated in this case for any construction/improvements in connection with the bridge is prohibited. Because the improvements to the Customs facility and approaches to and from the Bridge to the Customs facility contemplated under the MOA are, for the most part, being financed with public funds, implementation of the MOA would violate Michigan law, and hence, the Agreement should be declared invalid.

Intervenors rely upon M.C.L. § 254.1 and 254.32 in making this argument.

Section 254.1 provides as follows:

Bridges and culverts shall be considered in all respects as part of the road upon which they are, or are proposed to be located. The construction, improvement, repair and maintenance thereof, including adequate approaches and the doing of any act or the performance of any work necessary for the protection thereof, and also including the maintenance and operation of movable span bridges, shell be considered in all respects except as hereinafter otherwise provided, the same as the construction, improving and maintaining of the road upon which any such bridge or culvert is situated, and except as hereinafter oth-

erwise provided, shall be paid for accordingly.

Section 254.32 provides:

The provisions of this Act shall not apply to any bridge forming the boundary between the state and any foreign country.

Intervenors' argument is that although Section 254.1 authorizes payment for construction and improvements on bridges and approaches out of public funds, since Section 254.32 exempts bridges between the State and any foreign country, use of public funds for the Ambassador Bridge Customs facility project is in violation of the law.

As the Court stated on the record at the October 15, 1998 hearing, the problem with Intervenors' argument is that this matter involves a Federal project which is being funded with Federal funds. The State cannot constitutionally limit what the Federal government does to fund its projects. Furthermore, the Public Buildings Act, 40 U.S.C. § 601, et seq., makes clear that Customs facilities and approaches thereto are within the sole jurisdiction of the Federal government, not the State. See United States v. Certain Land, supra, 873 F.Supp. at 1054–55.

Therefore, the State Bridges and Culverts Act is inapplicable to this action.[14]

### 4. ATTORNEY GENERAL APPROVAL

■ Intervenors further argue that no action can be taken pursuant to the MOA and that any action already taken thereunder must be declared null and void because the MOA has never been approved by the

---

provided in Section 6.1.3.4, DIBC stated that it disburses funds to the Government when it receives an invoice. DIBC further represented that it has only been invoiced and disbursed funds for construction costs and has not been billed, nor paid for, any property acquisition.

The consequence of DIBC's refusal to fund the acquisition of Intervenors' property, of course—as all parties, including Intervenors, concede—is that condemnation of Intervenors' property would proceed under the General Condemnation Act and the Public Build-

ings Act, and the two appropriations statutes, P.L. 100–202 and 100–440, which this Court, and the Sixth Circuit, have already found provide ample authority for the condemnation. See, United States v. Certain Land Situated in the City of Detroit, 873 F.Supp. 1050, 1054–1056 (E.D.Mich.1994), affirmed ("for the reasons stated by the [district] court"), 76 F.3d 380, 1996 WL 26915 (1996) (unpublished opinion, text available on WESTLAW).

14. Intervenors' counsel conceded this issue on the record on October 15, 1998.

Attorney General. Section 8.4 of the MOA provides:

> It is understood by the parties that *all agreements between GSA and DIBC as consideration for settlement of this litigation are subject to the review of the Attorney General* .... GSA agrees to negotiate in good faith with DIBC to achieve satisfactory compliance with or overcome any legal objections that the Attorney General may have to this Agreement.

[MOA, Government's Ex. A, p. 29.]

To the extent that Intervenors construe the above-quoted provision making the MOA agreements "subject to the review" of the Attorney General as requiring the personal approval of **the** Attorney General, Intervenors are mistaken.

The Attorney General has by ·statute and regulation delegated the authority to settle and compromise lawsuits to the Assistant Attorneys General for the appropriate divisions within the Department of Justice for amounts up to $2 million. *See,* 28 U.S.C. §§ 516–518; 28 C.F.R. § 0.160.[15]

Here, the MOA contemplated payment by the Government to DIBC $1,240,000 as full settlement of the 1979 action. Acting

**15.** 28 U.S.C. §§ 516–518 provide, in relevant part, as follows:

> § 516. Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency or officer thereof is a party or is interested... is reserved to officers of the Department of Justice, under the direction of the Attorney General.
>
> § 517. The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States... to attend to the interests of the United States....
>
> *     *     *     *     *     *
>
> § 518. (b) When the Attorney General considers it in the interests of the United States, he may personally conduct... any case... or he may direct the Solicitor General or any officer of the Department of Justice to do so.
>
> 28 CFR § 0.160 provides as follows:
> (a) Subject to the limitations set forth in paragraph (c) of this section, *Assistant Attorneys General are authorized, with respect to matters assigned to their respective divisions, to:*
> (1) Accept offers in compromise of claims asserted by the United States in all cases in which the difference between the gross amount of the original claim and the proposed settlement does not exceed $2,000,000 or 15 percent of the original claim, whichever is greater;
> (2) Accept offers in compromise of, or *settle administratively, claims against the United States in all cases in which the principal amount of the proposed settlement does not exceed $2,000,000;* and
> (3) Accept offers in compromise in all nonmonetary cases.
>
> *     *     *     *     *     *
>
> (c) Any proposed settlement, regardless of amount or circumstances, must be referred to the Deputy Attorney General or the Associate Attorney General, as appropriate:
> (1) When, for any reason, the compromise of a particular claim would, as a practical matter, control or adversely influence the disposition of other claims and the compromise of all the claims taken together would exceed the authority delegated by paragraph (a) of this section; or
> (2) When the Assistant Attorney General concerned is of the opinion that because of a question of law or policy presented, or because of opposition to the proposed settlement by a department or agency involved, or for any other reason, the proposed settlement should receive the personal attention of the Deputy Attorney General or the Associate Attorney General, as appropriate;
> (3) When the proposed settlement converts into a mandatory duty the otherwise discretionary authority of a department or agency to promulgate, revise, or rescind regulations;
> (4) When the proposed settlement commits a department or agency to expend funds that Congress has not appropriated and that have not been budgeted for the action in question, or commits a department or agency to seek particular appropriation or budget authorization; or
> (5) When the proposed settlement otherwise limits the discretion of a department or agency to make policy or managerial decisions committed to the department or agency by Congress or by the Constitution.

Assistant Attorney General for the Environmental and Natural Resources Division of the Justice Department Barry Hartman approved the MOA and the payment by the Government of $1.24 million to DIBC called for thereunder on April 30, 1992. [See Exhibits to Intervenor–Defendants Motion for Order to Show Cause.] Assistant Attorney General Hartman clearly had express authority to approve the MOA and the monetary settlement for that amount.[16]

At the hearing on this matter, Intervenors argued that because the funds to be paid by DIBC to the Government is $2.6 million, the Assistant Attorney General did not have authority under 28 C.F.R. § 0.160. Intervenors misconstrue this regulation. The authority to settle claims applies *not* to what the Government may *accept* but rather, to what is required *to be paid out* of the United States Treasury. Here, the MOA contemplates payment of only $1.24 million to DIBC in settlement of the 1979 condemnation action. Therefore, the Assistant Attorney General acted within his statutory authority in this case.

### 5. COURT APPROVAL

■ Intervenors also contend, without any citation of documentary or legal authority, that Court approval of the final settlement of the 1979 condemnation action (involving DIBC's property) provided for in the MOA, "is a mandatory precondition to *all* condemnations pursuant to the MOA." [Intervenors' Brief, p. 16.] They claim that because no settlement order or judgment (of the 1979 action) was in place when the Government filed the two 1996 condemnation actions for the condemnation of their specific parcels of property, they were filed "without legislative author-

ity" and, therefore, should be dismissed. Again, Intervenors are mistaken.

■ The only precondition necessary for the filing of a condemnation action is that the federal agency have actual or implied legislative authority to acquire the land for a public purpose. *See Berman v. Parker,* 348 U.S. 26, 33–35, 75 S.Ct. 98, 102–104, 99 L.Ed. 27 (1954); *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 240–242, 104 S.Ct. 2321, 2329–30, 81 L.Ed.2d 186 (1984); *National Railroad Passenger Corp. v. Boston & Maine Corp.,* 503 U.S. 407, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992). Court approval has nothing to do with "legislative authority".

As noted above, both this Court and the Sixth Circuit have determined that ample legislative authority for condemnation of Intervenors' property exists under the General Condemnation Act and the Public Buildings Act, P.L. 102–393, and the two appropriations statutes, P.L. 100–202 and 100–440. *See, United States v. Certain Land Situated in the City of Detroit, supra,* 873 F.Supp. at 1054–1056; *United States v. Certain Land, supra,* 1996 WL 26915.

For these reasons, the Court finds no merit in Intervenors "lack of court approval" argument.

### 6. THE FEDERAL HIGHWAY ACT

■ Commodities and Lubienski fifth argument is that the MOA is subject to, but does not comply with, the Federal Highway Act, 23 U.S.C. § 101 *et seq.* The Intervenor–Defendants argue that because a truck off ramp is part of the project, the Federal Highway Act necessarily must apply to the project. They further argue that because prior to December 18, 1991, Section 301 of the Federal Highway Act

---

**16.** Intervenors argue that because DIBC represented in its April 7, 1994 Brief in Opposition to Intervenors' Motion for Preliminary Injunction that it has spent $5.5 million developing Bridge design modifications during the course of this litigation means that Mr. Hartman's approval of the MOA exceeded the au-

thority granted him in 28 C.F.R. § 0.160. DIBC's expenditures have nothing to do with the Assistant Attorney General's authority. The only limitation on his authority is the amount of any settlement that is to be paid out of the United States Treasury. DIBC's expenditures are irrelevant.

provided that "all highways constructed under the provisions of this title shall be free from tolls of all kinds," and because the Ambassador Bridge is a toll bridge, the construction contemplated under the MOA, and the MOA itself, is in violation of this Act.

The Federal Highway Act was enacted in 1958 for the construction and maintenance of highways connecting urban and rural areas through four "Federal-aid systems". *See* 23 U.S.C. §§ 102,103. These are the primary system, the urban system, the secondary system and the Interstate System of Highways. *Id.* Section 102 of the Act makes clear that the Act only applies to Federal-aid system projects and that such projects are to be funded through appropriations earmarked as Federal-aid system projects. The project for which Intervenors' property is being condemned is not a Federal-aid system project. None of the appropriations for the project were ever designated as Federal-aid system funds. Furthermore, the definition of "highway" in the Act is limited to

> that portion of any interstate or international bridge or tunnel and the approaches thereto, *the cost of which is assumed by a State highway department* . . . .

23 U.S.C. § 101. No state highway department is assuming the cost of the federal project at the Ambassador Bridge.

In making this argument, Intervenors also argue that the Government and this Court have throughout this litigation erroneously found authority for this project in the Public Buildings Act, 40 U.S.C. § 601 *et seq.* Intervenors, however, ignore the clear statutory language of the Public Buildings Act which specifically includes **border inspection facilities** in its definition of the term "public buildings" covered by the Act, **and includes** the grounds, **approaches,** and appurtenances to such buildings. See 40 U.S.C. § 612.

For these reasons, the Court finds the Federal Highway Act to be inapplicable in this case.

## 6. IMPROPER COLLUSION

■ Intervenors' last argument is that the MOA is invalid because of improper collusion between the Government and DIBC and that the true purpose of the MOA is to put Commodities' duty-free shop out of business. Intervenors argue, as they did in seeking their preliminary injunction, that collusion is established by the fact that DIBC has agreed to fund, in part, the costs of acquisition of property. The Court has already determined that DIBC's funding does not negate the public purpose of the project. *See, United States v. Certain Land, supra,* 873 F.Supp. at 1057–58. While egregious bad faith or fraud may be a defense to a condemnation action, the standard for proving such a claim is very high.

■ A litigant seeking to set aside a condemnation action taken within the discretionary authority of a government official must establish affirmative bad faith through arbitrary, capricious, or corrupt conduct. *See e.g., United States v. 91.69 Acres of Land,* 334 F.2d 229, 232 (4th Cir.1964). For a taking to be considered arbitrary or capricious, "[t]here must be basic to the project pervasive deception, unreasoned decision, or will-of-the-wisp determination." *United States v. 2,606.84 Acres of Land in Tarrant County, Texas,* 432 F.2d 1286, 1290 (5th Cir.1970). To allege bad faith a party must charge facts rather than conclusions, and such facts must suggest actual malevolence by the officer towards the complaining party. *United States v. Southerly Portion of Bodie Island,* 114 F.Supp. 427, 430 (E.D.N.C. 1953). Nor is it for the courts to consider broadside allegations that the purported public use to be served is merely a pretense or a sham to cover arbitrary official conduct ". . . . Only in cases of egregious bad faith will the right to condemn be denied." *United States v. 416.81 Acres of Land,* 514 F.2d 627, 631 (7th Cir.1975).

Intervenors have had more than a year to conduct discovery on their claim of collusion. Other than the fact that DIBC is funding the acquisition of property for the project, the only "evidence" of collusion which Intervenors have presented is excerpts of the transcript of Walter Lubienski's deposition in which Mr. Lubienski states that he "believes" and "feels" that the only purpose of the MOA is to put Commodities out of business. [See Lubienski dep., Intervenors' Ex. C.] Subjective beliefs and feelings do not amount to evidence.[17]

For all of the foregoing reasons, the Court finds no legal support for any of Commodities' and Lubienski's summary judgment arguments in the 1979 case. To the contrary, the Court finds the MOA and the settlement contemplated thereunder to be valid in all respects. Therefore, the Intervenor–Defendants' Motion for a Summary Judgment declaring the MOA invalid will be denied and the Government's and DIBC's Cross–Motions for Summary Judgment as to the validity of the MOA will be granted.

## IV. DEFENDANTS' MOTION TO DISMISS CASE NO. 96–75495

Commodities and Lubienski also have filed a separate Motion to Dismiss the Complaint and Vacate the Declaration of Taking in Case No. 96–75495. This is the condemnation action concerning the taking in fee of a corner of Commodities' parking lot and the taking of an easement over that parking lot for access to a Government parking lot which is to be constructed on adjacent property. Although captioned as a "Motion to Dismiss", because Defendants present matters outside the pleadings in support of their Motion, pursuant to Fed. R. Civ. Pro. 12(b), the Court will treat the motion as one for summary judgment and

decide the matter under the standards governing Rule 56 motions. *See* Section III(B)(1) of this Opinion and Order.

In their Motion to Dismiss, Commodities and Lubienski first raise the same arguments they raised in their Motion for Summary Judgment. The Court has already rejected those arguments in Section III of this Opinion and Order. Additionally, Defendants contend that the Government's Declaration of Taking should be set aside and vacated because they claim that the Government failed to comply with the Declaration of Taking Act, 40 U.S.C. § 258a. Specifically, Defendants claim that the Government has not complied with the Act's requirement that the Government act in good faith and deposit an adequate amount of money into the court's registry as "estimated by said acquiring authority to be just compensation for the land taken".

In this case, when the condemnation action was filed, the Government deposited $5,000.00 with the Court. Defendants contend that this is grossly inadequate claiming, without any evidentiary support whatsoever, that the Government must pay Commodities "several million dollars". Therefore, Defendants reason that the Government must be deemed to have deposited that sum in bad faith.

Defendants apparently misapprehend that the Act only calls for the deposit of an *estimate* of the compensation for the property taken. The actual compensation to which Defendants are entitled will be decided at trial.

The Declaration of Takings Act provides, in pertinent part, as follows:

> In any proceeding in any court of the United States . . . which has been or may be instituted by and in the name of

17. At the October 15, 1998 hearing, Intervenors represented that they were relying on their argument regarding the lack of authorization for the project under P.L. 102–393 due to the absence of an Approved Plan as evidence of collusion. As discussed in Section III(1), *supra*, the Court has already found no merit in Intervenors' "not-pursuant-to-the-MOA" argument. Therefore, to the extent that Intervenors rely upon that argument as evidence of improper collusion, the Court has already rejected it.

and under the authority of the United States for the acquisition of any land or easement ..., the petitioner may file in the cause, with the petition or at any time before judgment, a declaration of taking signed by the authority empowered by law to acquire the lands described in the petition, declaring that the lands are thereby taken for the use of the United States. Said declaration of taking shall contain or have annexed thereto-

\* \* \* \* \* \*

(5) A statement of the sum of money estimated by said acquiring authority to be just compensation for the land taken.

Upon the filing [of] said declaration of taking and of the deposit in the court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to said lands in fee simple absolute or such less estate or interest therein as is specified in sad declaration, shall vest in the United States of America, and said lands shall be deemed to be condemned and taken for the use of the United States, and the right to just compensation for the same shall vest in the persons entitled thereto; and said compensation shall be ascertained and awarded in said proceeding, and established by judgment therein, and the said judgment shall include, as part of the just compensation awarded, interest at the rate of 6 per centum per annum of the amount finally awarded as the value of the property as of the date of taking, from said date to the date of payment; but interest shall not be allowed on so much there-

of as shall have been paid into the court.

40 U.S.C. § 258a (emphasis added).

In *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), the Supreme Court explained the above-quoted language as follows:

The purpose of the statute is two-fold. First, to give the Government immediate possession of the property and to relieve it of the burden of interest accruing on the sum deposited from the date of taking to the date of judgment in the eminent domain proceeding. Secondly, to give the former owner, if his title is clear, immediate cash compensation to the extent of the Government's estimate of the value of the property. **The Act recognizes that there may be an error in the estimate, and appropriately provides that, if the judgment ultimately awarded shall be in excess of the amount deposited, the owner shall recover the excess with interest ....**

\* \* \* \* \* \*

**The payment is of estimated compensation; it is intended as a provision and not a final settlement with the owner; it is a payment "on account of" compensation and not a final settlement of the amount due.**

317 U.S. at 381, 63 S.Ct. at 283–84 (emphasis added).

The foregoing makes clear that the sum deposited with the Court is merely a "down payment" on the final amount of compensation as determined by entry of judgment.

Defendants, nonetheless, argue that the Court must independently examine, at this stage of the litigation, the adequacy of the amount deposited. In support of their argument, Defendants rely on *United States v. 44.00 Acres of Land*, 110 F.Supp. 168 (S.D.N.Y.1953).[18]

18. Although in Defendants' citation of this case they represent that the case was affirmed by the Second Circuit and that certiorari was denied by the Supreme Court, this citation is wrong. The appellate court decision cited, 234 F.2d 410 (2nd Cir.1956), was not an appeal of the district court order discussed by Defendants in their brief. It involved an appeal of a subsequent order of the district court concerning the awarding of interest. it had nothing to do with the district court's vacating of the declaration of taking.

In that case, the Government filed the first Declaration of Taking, and deposited $300,000 with the district court. The Government subsequently amended its Declaration of Taking declaring the estimated compensation to be $500,000 and accordingly, deposited another $200,000 with the court. The district judge subsequently vacated the Declaration of Taking on the ground that the original estimate of $300,000 as the value of the land taken was made in bad faith. The evidence showed that the Government had previously estimated the property to be worth $500,000 and had prepared a Declaration of Taking based on this estimate which was never filed. Instead, the Government filed the Declaration of Taking which contained an estimate of only $300,000 as the value of the property taken. It was the evidence that the Government knew when it filed the $300,000 Declaration of Taking that the value of the property was worth substantially more than $300,000 that convinced the Court that the Government had filed the $300,000 Declaration in bad faith.

Although the district court in *44.00 Acres of Land* observed that "[t]here can be no doubt that the court may not substitute its judgment for what is just compensation for the administrative determination of the acquiring authority", it determined that it did have authority to review the statement of estimated just compensation "where the good faith of the acquiring authority is unequivocally challenged **and where the challenge is supported by a prima facie showing of lack of good faith** and noncompliance with the statute." 110 F.Supp. at 171–72.[19]

Other courts, however, have made it clear that the district court's belief that the amount deposited is inadequate does not give it the authority to vacate a taking under a "bad faith" exception. For example, in *In re United States of America Praying for a Writ of Mandamus*, 257 F.2d 844 (5th Cir.1958), the district court had vacated a declaration of taking because in its view, the deposit was made in bad faith. The Fifth Circuit reversed the district court's action, explaining:

With deference to the contrary views of the district judge, we deem the settled law to be that the purported bad faith exception to the rule of finality of the administrative estimate of just compensation does not exist, that, in short, the courts have no jurisdiction to review the amount of estimated compensation, none to set aside or vacate a declaration of taking, none to refuse a declaration of possession on the grounds asserted here. If the law were otherwise, a district judge, under the guise of determining whether the declaration of taking was in good faith and the amount sufficient to escape the charge that it was arbitrary or fraudulent, could superintend the whole act of taking, vesting title, and acquiring possession, and thereby prevent its accomplishment unless the amount estimated measured up to his idea of what that amount should be. This court has held precisely to the contrary.

\* \* \* \* \* \*

The statute itself is clear. It provides that the declaration of taking contain a statement of the sum of money *"estimated by said acquiring authority to be just compensation* for the land taken." Congress plainly gave the acquiring authority, not the courts, the function of estimating just compensation for this purpose. And the lack of court review

19. The Second Circuit has never expressly ruled on the propriety of judicial inquiry into the sufficiency of the deposit of estimated compensation. In discussing the district court's action in vacating the declaration of taking in *44.00 Acres of Land,* the Second Circuit merely assumed that a court may do so. *See United States v. 44.00 Acres of Land,*

234 F.2d 410, 415 (2nd Cir.1956), *cert. denied,* 352 U.S. (1956) ("We concede, *arguendo,* that a court has jurisdiction to vacate a Declaration of Taking where, contrary to the implied requirements of the statute, the estimate of the value of the condemned property is made by the Government in bad faith.")

is evident from the fact that when the declaration is filed and the deposit made in court "title to the said lands * * * shall vest in the United States of America, and said lands shall be deemed to be condemned * * *." Had Congress intended court review of the declaration or the amount of the estimate it would have provided for some court action by way of approval before title passed. It did not require any court action in this particular. Likewise, because it did not contemplate any court action, it made no provision for response by the condemnee or even for notice prior to vesting of title.

*Id.* at 848–49 (citations omitted and emphasis added).

Similarly, in *United States v. Cobb*, 328 F.2d 115 (9th Cir.1964), the district court vacated a declaration of taking because it found that the deposit of estimated just compensation ($1.00) was grossly inadequate and, therefore, ipso facto, was made in bad faith. The Ninth Circuit reversed the district court's action, explaining:

In the first place, [in the statute,] the administrative officials have been delegated the authority to make the declaration of taking and to make the estimate. In this case, the estimate was made by the Assistant Secretary of Agriculture. There is nothing in the statute which suggests that the district court has any right to review the action of the Assistant Secretary. . . .

The main objection to permitting the Judge to go into the question of good faith is that he thereby could do what he clearly is not authorized to do, namely, pass upon the appropriate amount of deposit. If, for instance, $50,000 were deposited and the Judge were of the opinion that fair compensation would be $500,000, he could, under the guise of passing on good faith, say that the discrepancy proved lack of good faith. The result would be that in practically every case of contested condemnation the defendant would first try the question of

good faith, and thereafter the question of just compensation would have to be tried all over again. This, we think, was not the contemplation of Congress.

*Id.* at 116–17.

This Court agrees with the Fifth and Ninth Circuits. As the Fifth Circuit observed, had Congress intended court review of the amount of the estimate it would have provided for some court action by way of approval before title passed. It did not do so. Rather, Congress has left it to the acquiring authority to determine the amount to be deposited as an estimate of just compensation.

Moreover, even assuming *arguendo* that the Court does have authority to review the sufficiency of the deposit under a "bad faith" exception, unlike *44.00 Acres of Land, supra,* where the court was presented evidence of bad faith beyond merely the amount of the deposit, here, Defendants have presented no such evidence other than Mr. Lubienski's subjective beliefs and feelings of "collusion" which, as indicated above, do not constitute sufficient evidence of collusion.

For these reasons, the Court will deny Commodities' and Lubienski's Motion to Dismiss the Government's Complaint and to the Vacate Declaration of Taking.

## V. CONCLUSION

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Commodities Export Company's and Walter Lubienski's Motion for a Summary Judgment be, and hereby is, DENIED.

IT IS FURTHER ORDERED that the Government's and DIBC's Cross–Motions for Summary Judgment be, and hereby are, GRANTED.

Commodities Export Company and Walter Lubienski having been granted leave to intervene in the 1979 action for the purpose of contesting the validity of the MOA,

and the Court having determined that the MOA is valid,

IT IS FURTHER ORDERED that Commodities Export Company and Walter Lubienski be, and hereby are, DISMISSED from Case No. 79–CV–73934.

IT IS FURTHER ORDERED that Commodities Export Company's and Walter Lubienski's Motion to Dismiss Complaint and Vacate Declaration of Taking in Case No. 96–CV–75495 be, and hereby is, DENIED.

The Court having rejected Commodities' and Lubienski's "lack of legislative authority" arguments, and it being undisputed that the condemnation of Defendants' property is for a public purpose, this case will, accordingly, proceed to trial on the issue of just compensation to be paid to Commodities and Lubienski for the taking of their property.

SO ORDERED.